[No. 9222. *En Banc.* June 7, 1911.]

WILLIAM L. BILGER et al., Respondents, v. THE STATE OF WASHINGTON et al., Appellants.[1]

NAVIGABLE WATERS — RIPARIAN AND LITTORAL RIGHTS. Under Const., art. 17, § 1, wherein the state asserts the ownership of the bed and shores of all navigable waters in the state to high water mark, the owner of upland under patents from the Federal government has no riparian or littoral rights as against the state, which holds the title of the beds and shores in fee, free from incumbrances or easements of any kind.

NAVIGABLE WATERS—SHORES AND BEDS—TITLE—CONVEYANCE FROM STATE. Abutting upland owners on a navigable lake, who purchased the shore lands from the state after the state had granted to the United States the right to lower the waters of the lake, take subject to such right.

NAVIGABLE WATERS—STATE GRANTS—LICENSE OR EASEMENT. An act of the state legislature in aid of a ship canal, granting to the United States the right to lower the waters of a navigable lake, is the grant of an easement, rather than a mere revocable license.

[1]Reported in 116 Pac. 19.

SAME—LICENSES—REVOCATION.  A license by the state to the United States to lower the waters of a lake, in aid of the construction of a canal, is one coupled with an interest, and not revocable, where the United States made and expended appropriations for the work on the faith thereof.

NAVIGABLE WATERS—RIGHTS OF ABUTTERS—LOWERING WATERS—AUTHORITY.  Where the Federal government has been granted authority to lower the waters of a lake by a canal, abutters on the lake cannot object that the work is being done by the state and county, where the state and county are doing the work on behalf of the Federal government, to whom it will belong when completed.

STATES—USE OF FUNDS.  The state can lend its aid to enterprises undertaken by the Federal government.

CANALS—CONSTRUCTION BY FEDERAL GOVERNMENT—STATUTES.  The intention of the Federal government to undertake the work of constructing a ship canal within the requirements of a state act providing therefor, is sufficiently shown by Federal appropriations amounting to over two and a quarter millions of dollars for the purpose.

CONSTITUTIONAL LAW—DUE PROCESS—ASSESSMENTS FOR IMPROVEMENTS.  Property is not taken without due process of law by the act of 1907, p. 582, which provides for the construction of the Lake Washington canal at the expense of property benefited, after an assessment with a hearing before a board empowered to equalize the assessment and right of appeal to the courts.

CONSTITUTIONAL LAW—CLASS LEGISLATION.  An act authorizing a county to levy assessments upon lands benefited by a ship canal does not violate Const., art. 1, § 12, prohibiting the granting of special privileges and immunities to any citizens or class of citizens or corporations other than municipal, since a county is a municipal corporation.

STATES—USE OF FUNDS.  Federal Const., art. 1, § 10, does not restrict the power of the state to aid in enterprises undertaken by the Federal government.

EMINENT DOMAIN—COMPENSATION — ASSESSMENTS FOR BENEFITS.  An act authorizing the assessment of property benefited by a local improvement relates to the taxing power, and not to the taking or damaging of private property for a public use without compensation, prohibited by Const., art. 1, § 16.

COUNTIES—IMPROVEMENTS—POWER TO MAKE.  The limitations of Const., art. 7, § 8, upon the power of cities, towns, and villages, to make local improvements has no application to counties.

COUNTIES — OFFICERS — ASSESSMENT — COMMISSIONERS.  Commissioners to equalize a county assessment for the construction of a

ship canal are not county officers, within Const., art. 11, § 5, requir-
ing that all county officers be elected, and accordingly they may be
appointed.

TAXATION—IMPOSITION BY STATE. An act authorizing a county
to levy a special assessment for benefits accruing from a public im-
provement is not the imposition of a tax upon the county by the
state, prohibited by Const., art. 11, § 10.

CANALS—CONSTRUCTION—STATES—AUTHORITY—STATUTES. The act
of 1909, creating a special fund and appropriating moneys there-
from to be expended in the construction of the Lake Washington
canal, theretofore authorized by other legislation, cannot be in-
voked by taxpayers as in any manner affecting the authority for the
construction of the canal.

STATES—FUNDS—MISAPPROPRIATION — ACTIONS — PARTIES. A tax-
payer cannot complain in equity of the misappropriation of public
funds by state officers, as the attorney general is the proper person
to institute such suits.

Appeal from a judgment of the superior court for Thurs-
ton county, Mitchell, J., entered October 28, 1910, in favor
of the plaintiffs, after a trial on the merits before the court
without a jury, in an action to enjoin proceedings for the
construction of a canal, and for other equitable relief.  Re-
versed.

*W. P. Bell, Attorney General,* and *W. V. Tanner, Assistant,
George F. Vanderveer, Roger S. Greene, Harold Preston,*
and *H. A. P. Myers,* for appellants.

*Thomas A. Meade* (*P. C. Sullivan,* of counsel), for re-
spondents.

FULLERTON, J.—The respondents, who own real property
bordering on the shores of Lake Washington, in King county,
brought this action to enjoin the construction of a public im-
provement known as the Lake Washington canal, averring
that the construction thereof according to the plans adopted
will damage their property, and that no provision has been
made for paying such damages.

To an understanding of the questions involved, a somewhat
extended statement of the facts is necessary.  Lake Wash-

ington, on the shores of which the respondents' property is situated, is a body of fresh water, ranging in width from two to four and one-half miles, having a length of some twenty-five miles. Its banks below the surface of the water, for the greater part descend abruptly to the mean depth of the lake, which is about two hundred feet. The normal surface level of the lake is some 31.5 feet above mean lower low water in Puget Sound. Lying immediately west of Lake Washington, is Lake Union, a body of fresh water having an area of about 900 acres, with an average depth of perhaps 40 feet, and a mean level above mean lower low water in Puget Sound of some 22.5 feet. Still further west, is Salmon Bay, which is connected directly through Shilshole Bay with Puget Sound, and is affected by the ebb and flow of the tide. The canal when constructed will connect Lake Washington with Puget Sound, passing through Lake Union, Salmon Bay and Shilshole Bay. According to the plans adopted, it is intended to raise Salmon Bay to a level with Lake Union by a lock and dam constructed across the narrows thereof, and to lower Lake Washington to a level with that lake by means of an open canal connecting the two lakes.

The government of the United States interested itself in the enterprise for the first time in 1890, when Congress made an appropriation for a survey of the route of the proposed canal. Since that time numerous appropriations have been made looking toward the completion of the enterprise, aggregating more than $550,000, and the secretary of war has been authorized to enter into a contract for the construction of locks and other accessory works at the narrows in Salmon Bay, at a cost not to exceed $2,275,000. One of the earlier appropriations was made contingent on the fact that the entire right of way for the canal be secured to the United States free of cost and free from all liability for damages arising by the construction of the canal. Later on, the government took the position that the property specially benefited by the construction of the canal should bear its just proportion of

the cost of the same, and the act making the last appropria-
tion, if not one other, contained a proviso to the effect that
the secretary of war, before beginning the work of construct-
ing the locks and other accessory works, should be satisfied
that King county, or some other local agency, would do the
excavation in the waterway above the locks to the "dimen-
sions recommended in said project," and would "secure the
United States from liability for any claims or damages on
the account of. . . . the lowering of the level of the Lake
Washington, raising the level of Salmon Bay, or any other
alteration of the level of any part of said waterway." In
compliance with the first of these requirements, the legislature
of the state of Washington, in 1895, passed an act author-
izing counties to condemn land "whenever the government of
the United States or of this state is intending or proposing
the construction, operation or maintenance of any public work
. . . . and such condemnation or appropriation will enable
the county to aid, promote, facilitate or prepare for such con-
struction . . . or to fulfill or dispose of any condition upon
which such construction . . . . is by law or for any cause
contingent." The act also provided for a tax levy to pay the
cost of any such condemnation proceedings. Laws 1895,
page 3.

Acting pursuant thereto, the county of King, by condem-
nation and purchase, acquired the right of way for a canal
for the full width required by the secretary of war, and
deeded the same to the United States. The cost of this pro-
ceeding does not appear in the present record, but it was
shown in another action, brought to enjoin certain other pro-
ceedings had in connection with the construction of the canal,
to have exceeded $225,000. In further pursuance of the
same design, the legislature in 1901 passed an act granting
to the United States the right to raise the waters of Salmon
Bay, and the right to lower the waters of Lake Washington,
in so far as the same should be necessary in the construction
of the proposed canal, releasing the "United States from all

liability to damages to this state, its successors or assigns, that shall or might arise from such lowering or raising" of such waters. Laws 1901, page 7. At the time of the passage of this act, the state of Washington owned all of the shore lands bounding Lake Washington, with the possible exception of one tract which is not affected by this action.

For the purpose of enabling the agencies interested to comply with the second requirement imposed by the United States, the legislature, in 1907, passed an act providing, in substance, that whenever the government of the United States "is intending or proposing the construction or operation of any river, lake, canal or harbor improvement," the county commissioners were empowered to levy upon the property benefited by such proposed improvement an assessment "for the purpose of paying the expenses of such improvement, or so much thereof as said board of county commissioners shall determine." Laws 1907, page 582. Acting pursuant to this act, the county commissioners of King county levied an assessment to be expended on the construction of the proposed canal, fixing the amount thereof at the sum of $1,075,000, and caused an assessment district to be formed of property thought to be benefited by the proposed improvement, and levied an assessment thereon equal to the sum above named, a proportional share of which was levied upon the property of the respondents in this action. In 1909 the legislature passed an act creating a state shore land improvement fund, and appropriated out of the fund the sum of $250,000 to be expended in the "construction or improvement of what is known as the Lake Washington canal." The act provided that the sum appropriated should be subject to the order of the United States government engineer having the improvement in charge, who was authorized to expend the same in the excavation of the canal.

In August, 1909, a contract was let by the engineer in behalf of and in the name of the state of Washington, with the appellant C. J. Erickson, by the conditions of which Erickson

undertook to excavate a channel between Lake Union and Lake Washington, a distance of some two thousand feet. The specifications called for a cut varying between 70 and 80 feet in width at the bottom, with a side slope of ¼ horizontal to 1 vertical, the bottom of the cut to commence at an elevation of 25 above mean low water in Puget Sound at Lake Union, and thence gradually rise to an elevation of 40 feet above the same level at Lake Washington. This channel was completed according to contract, and another contract was let for a cut along the center line of the channel excavated under the first contract, the bottom of which was to be "at elevation 30," and the upper end, the Lake Washington end, to be cut off from the lake by a series of five gates, the tops of which are "at elevation 40," so as to permit the flow of water through the cut and at the same time control such flow. This cut was also completed.

The respondents acquired their uplands through mesne conveyances from the United States, patent issuing on September 27, 1889. They purchased the shore lands bordering thereon from the state of Washington on December 4, 1903. This action was begun in October, 1909, and such subsequent proceedings were had therein as to result in a decree entered on October 28, 1910, restraining and enjoining the defendants "from taking further proceedings to the effect and intent of excavating said Lake Washington canal, or any part thereof, or of lowering the water of Lake Washington, or of levying said assessment, or of issuing any warrants thereunder, or creating any indebtedness of said estate or county for the purpose or with the intent of excavating said canal, or for the purpose or to the end and effect of lowering the waters of said Lake Washington." This appeal followed.

The record does not advise us as to the grounds on which the learned trial judge justified the somewhat sweeping decree entered, but counsel for respondents urge in its support two principal contentions, which we shall notice in their order. The first contention is, that since the respondents own both

upland and the shore lands fronting on the borders of Lake Washington, they have riparian and littoral rights in the waters of the lake, with the right of egress and ingress to and from their lands and the waters of the lake; that the lowering of the waters of the lake, as it is intended to do by the construction of the canal, will interfere with these riparian and littoral rights, as it will cut off their right to pass to and from their lands and the waters of the lake and otherwise interfere with the use of their property; that these rights are valuable and their deprivation will damage them as owners of the land in a large sum of money; and that no compensation has been made them for such damages, nor has the same been ascertained and paid into court for their use, as required by § 16, art. 1 of the state constitution and the fourteenth amendment of the constitution of the United States.

In so far as the claim of riparian and littoral rights is based on the grant of the uplands, we have frequently held it to be without right. In its disposition of the public lands, except in isolated cases and for special purposes, the United States has never purported to convey to private grantees any portion of the beds or shores of the navigable waters. These it reserved for the benefit of the states, and on the admission of any territory in the Union as a state, the shores and beds of the navigable waters included therein became the property of the state. It was so in the territory which now comprises the state of Washington. The government grants of the uplands bordering on the navigable waters therein extended down to the line of ordinary high water only, leaving the beds and shores of such navigable waters intact, so that dominion over them could be assumed on the admission of the state into the Union. Such dominion was assumed by the state of Washington. By § 1 of art. 17 of the state constitution, the state asserted its ownership of the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water

within the banks of all navigable rivers and lakes. This title, we have frequently held, is title in fee, free from encumbrances and easements of any kind, and hence, free from any claim of the upland owner to riparian and littoral rights. *Eisenbach v. Hatfield*, 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632; *Brace & Hergert Mill Co. v. State*, 49 Wash. 326, 95 Pac. 278; *Grays Harbor Boom Co. v. Lownsdale*, 54 Wash. 83, 102 Pac. 1041, 104 Pac. 267; *Lownsdale v. Grays Harbor Boom Co.*, 54 Wash. 542, 103 Pac. 833. It follows, therefore, that such littoral and riparian rights as the respondents have in the waters of Lake Washington were acquired by them in virtue of the purchase of the shore lands made by them from the state of Washington. By a reference to the dates above given, it will be observed that the respondents acquired these shore lands on December 4, 1903, a time subsequent to the grant made by the state to the United States in 1901 conferring upon the United States the right to lower the waters of the lake. Since the respondents' title is subsequent thereto, it is necessarily subject thereto, and if the grant to the United States be valid, the respondents have no rights of property that can be affected by the lowering of the waters of the lake. The state, like any other individual owner of property, may convey its property in any manner that it deems fit. It may grant an easement therein to one party and the remaining interest therein to another. But it can make but one valid grant of the same property, hence, as we say, if it has granted to the United States the right to lower the waters of Lake Washington, it could not subsequently grant to the respondents, by a mere deed to its shore land bordering on the lake, the right to estop the United States from exercising the privilege granted.

But the respondents say that the grant to the United States conveyed nothing; that it was a mere license revocable at the pleasure of the state at any time, and that it was so revoked by the deeds of the shore lands to the respondents. An examination of the act itself will show that it was intended to be

something more than a mere license.   It has all the indicia of a grant.   It recites that in "aid of the construction, maintenance and operation of a ship canal by the United States of America to connect the waters of Lakes Union and Washington with Puget Sound  . . . . there be and hereby is granted by this state to the United States  . . .  the right to lower the waters of Lake Washington in prosecution of such improvement, and this state hereby releases the United States from all liability to damages to this state, its successors and assigns, that shall or might arise from such lowering  . . ."  It is the solemn act of the legislature of the state, and bears upon its face the approval of the state's chief executive.   The privilege granted was one within the power of the state to grant, and in law we think it the grant of an easement rather than the conferring of a mere revocable license.

But if the grant were to be treated as a license we would still think it enforcible against any right acquired by the respondents.   As we have elsewhere stated, some of the appropriations for the canal on the part of the United States were made on the express condition that the state should secure the United States against all claims for damages arising from the construction of the canal.   This act was passed in compliance with that requirement.   The government officials accepted it as such and expended the moneys appropriated on the faith thereof.   The license, if it were such, would thenceforth have to be treated as one coupled with an interest, which the state could not revoke without the consent of its licensee.

It is said further that the grant is made to the United States, that the canal is being dredged by the state of Washington and King county, and that there is no privity of contract or of relation shown to exist between the United States and the state and county.   But while it is true that the actual work of dredging the canal between Lakes Washington and Union is being done by the state and the county of King, it is also true that they are doing the work on behalf of the United

States. The record, as we have shown, discloses that the government has required King county or some other local agency to dredge the canal from a point above the locks to Lake Washington, and that it was in compliance with this requirement that this particular work was undertaken. But the work is nevertheless the work of the government of the United States, and the canal when completed will be the property of that government, and owned, controlled and operated by it. That the state may lend its aid to public enterprises undertaken by the government was expressly decided by this court in *Lancey v. King County*, 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817.

Again, it is said that the United States has never undertaken to construct the canal, and that this court so held in *State ex rel. Burke v. Board of Com'rs*, 58 Wash. 511, 109 Pac. 350. In the case cited we did say that there was no sufficient evidence of any intention or proposal on the part of the government to construct or operate the canal, but that was said prior to the act of the 2d session of the 61st Congress, which appropriated $150,000 for that purpose, and made available for the same purpose some $2,124,000 more. This latter act set all doubts on the question at rest, and there can no longer be any question as to the intent and purpose of the government.

We need not, of course, inquire in this action what remedy the respondents have against the state on account of its failure to except this previously granted right to the United States from the conveyance it made to them of the shore lands. Whether the present normal water level marks the lake boundary of these conveyances, and their remedy is for a breach of warranty express or implied in the deed of conveyance, or whether the state actually conveyed to them all the land lying between the boundary of the uplands and the normal level of the lake as it will appear when lowered, and there was in fact no attempted conveyance of property in which it had theretofore granted an easement, must be

reserved for determination in some future action where the question is necessarily presented. We are clear, however, that the respondents took their deeds subject to the right of the United States to lower the waters of the lake to a level necessary to the successful construction and operation of a canal leading from the lake by way of Lake Union and Salmon Bay to Puget Sound, and that the respondents have no cause of action arising from the fact that the level of the lake will be lowered.

The second principal contention made on behalf of the respondents is that the act of 1907, under which the defendants purport to be acting, is in violation of both the state and Federal constitutions. It is said to violate §§ 3, 12 and 16 of art. 1; § 9 of art 7, and §§ 5 and 12 of art. 11 of the state constitution; and § 10 of art. 1, and the 5th and 14th amendments of the constitution of the United States. We shall, however, notice the contention but briefly. Elsewhere we have stated the purpose of the act. Generally speaking, this purpose was to enable a county to levy an assessment upon property benefited by a public improvement to pay a portion of the cost of constructing the improvement. The act contains provisions applicable to this general purpose. It provides for the making of an assessment, for a hearing thereon before a board empowered to equalize the assessment, and an appeal to the courts by any party aggrieved from the order of confirmation. This, to our minds, satisfies the requirements of § 3, art. 1 of the state constitution, and the 5th and 14th amendments to the Federal constitution, which forbid the deprivation of any person of life, liberty, or property without due process of law.

The objection suggested by the reference to the 10th section of art. 1 of the Federal constitution is met by what was said in the case of *Lancey v. King County, supra*, where we had under consideration the constitutionality of the act of 1895, under which the right of way for the proposed canal

was condemned by King county and conveyed to the United States. Section 12 of art. 1 prohibits the granting to any citizen, class of citizens, or corporations, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations. The applicability of this section to the act in question is not to our minds very clear, and counsel have not undertaken to enlighten us as to the precise point thought to be involved. The only privilege which we have been able to discern that is granted by the act which is not granted to all persons and corporations alike, is the vesting of power to make assessments in the counties of the state. But counties, being municipal corporations, it will be observed, are expressly excepted from the terms of the prohibition. Section 16 of art. 1 is the provision relating to the power of eminent domain, and prohibits the taking or damaging of private property for public use until compensation is made to the owner therefor, or the amount of such compensation is ascertained and paid into court for his use. But this act does not provide for taking or damaging of private property for a public use within the meaning of this section of the constitution. True, it provides for an assessment of property for benefits, but this relegates the act to the provisions relating to taxing power rather than to those relating to the power of eminent domain. Section 9 of art. 7 relates to the power of the corporate authorities of "cities, towns, and villages" to make local improvements by special assessments. It has no application to "counties," and hence any limitation it may place on the powers of the first named municipalities has no application to the second.

Section 5 of art. 11 requires the legislature to provide for the election of county, township, precinct, and district officers, prescribe their duties, fix their term of office, and regulate their compensation in proportion to their duties. The act of 1907 provides that the assessment of benefits authorized to be made by the act shall be made by an ap-

pointive commission, and, if we understand the respondents, it is thought that this commission should have been made elective, and the fact that it was not made so renders the act amenable to the constitutional provision cited. But commissioners appointed by a municipality to make an assessment of benefits are in no sense officers of such municipality. While, generally speaking, an officer is one employed on behalf of the government, in a strict legal sense it means an employment on behalf of the government in some fixed and permanent capacity, not in a capacity merely transient, occasional or incidental. Those engaged in mere transient or occasional employments on behalf of the municipality are more properly employees than officers, and it was not the purpose of this section of the constitution to require that mere employees should be elected. Section 12 of art. 11 declares that the legislature shall have no power to impose taxes upon counties, cities, towns, or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may by general laws vest in the corporate authorities thereof the power to assess and collect taxes for such purposes. The act in question here is not within any of the provisions of this section. The state is not intending or purporting to impose a tax upon any county, city or town for county, city or town purposes. It has merely provided a method by which the county may levy on itself a special assessment for benefits accruing from a public improvement, in part payment of the cost of the improvement; the law itself imposes no such tax. We conclude, therefore, that the act is not void for any of the constitutional reasons suggested, and that the decree of the trial court cannot be justified on the theory of the invalidity of the act.

The act of 1909 is also said to be unconstitutional, but we feel that we are not warranted to inquire into this question at the instance of the respondents, as it in no manner

affects any right of theirs, other than such as belongs to them in common with the public at large as citizens and taxpayers of the state. The act creates a special fund and appropriates money therefrom "to be expended in the construction or improvement of what is known as the Lake Washington Canal," but it is not the source of authority under which the persons constructing the canal are acting. Their power and authority is derived from other legislation which we hold to be valid, hence, this act does not so far form a part of the general scheme as to require the cessation of the work if it be unconstitutional. Neither can the respondents, in virtue of their rights as taxpayers, inquire into the constitutionality of the act. Courts of equity will not inquire into the action of state officers accused of misappropriating public funds on the complaint of a citizen and taxpayer, as the attorney general of the state is the proper person to institute suits where there has been a wrongful disposition of the public revenue. *Jones v. Reed*, 3 Wash. 57, 27 Pac. 1067; *Birmingham v. Cheetham*, 19 Wash. 657, 54 Pac. 37; *Tacoma v. Bridges*, 25 Wash. 221, 65 Pac. 186.

The appellants contend that no right of recovery exists for damages to shore lands bordering on a navigable waterway by changes in the surface level or in the course of the current thereof, when such changes are made by the general government in the improvement of the navigability of such waterway. And they argue in the case at bar with great force that these respondents have no cause of complaint because the change here contemplated is in the interest of public navigation. But we prefer to rest the case on the reasons heretofore given, and mention this question for the purpose of saying that we express no opinion upon it, but leave it for consideration when it arises in a case involving it directly.

The judgment of the trial court is reversed, and the cause remanded with instructions to enter a judgment to

the effect that the respondents, plaintiffs below, take nothing by their action, and that the appellants recover their costs.

DUNBAR, C. J., CHADWICK, GOSE, MOUNT, MORRIS, and CROW, JJ., concur.

PARKER, J. (concurring)—I concur upon the grounds assigned by Judge Fullerton in disposing of respondents' first principal contention. I desire, however, to refrain from becoming committed to the view that the special assessment act of 1909 is constitutional. It seems to me that, since we conclude that respondents' property is not being taken, it is immaterial to their rights in this cause that reliance for raising some of the funds is placed upon this act. I think the power to raise revenue by *special assessment* for a purpose of this nature becomes, in the light of the uniform taxation restrictions and other provisions of the constitution, a question of such serious moment that it should not be determined here upon the very limited argument presented and the lack of necessity for such decision. I concur in the result.

ELLIS, J., took no part.