## . CHARLESTON.

STATE, *ex rel.* FRANCES P. KEY *v.* JOHN C. BOND, *Auditor.*

Submitted June 1, 1923.   Decided June 6, 1923.

1. OFFICERS—STATUTES—*Nature of Public Office Stated; Meaning of "Public Office" Defined in Sense of Requirement of General Laws in Prescribing Terms, Duties, etc., of Public Officers.*

   Generally speaking, a public office is a position created by law, with duties cast upon the incumbent which involve an exercise of some portion of sovereign power and in which the public is concerned, continuing in their nature, and not merely occasional or intermittent. It is this sense in which the term is used in section 8, article IV of the Constitution. (p. 260).

2. SAME—*Office of "Public Officer" Must be Created by Law.*

   One occupying such a position is a public officer; but to be a public officer, his office must be created by law.   (p. 261).

3. MASTER AND SERVANT—*Principal and Agent—"Agent" Defined; "Servant" or "Employee" Defined.*

   An agent in the restricted and proper sense is a representative of his principal in business or contractual relations with third persons; while a servant or employee is one engaged, not in creating contractual obligations, but in rendering service, chiefly with reference to things but sometimes with reference to persons when no contractual obligation is to result.   (p. 261).

4. STATUTES—*"Public Agent" Defined; "Public Officer" and "Public Agent" Distinguished.*

   Under section 8, Article IV of the Constitution, the term "public agent" means one engaged temporarily and specially in the performance of public duties, prescribed by law, and as such, vested for the time being with some portion of sovereign authority to represent the state in contractual relations with third persons; the chief distinction between a "public officer" and a "public agent", as the terms are there used, is that the duties of the former are generally continuing in their nature; while those of the latter are special and occasional or intermittent.   (p. 261).

5. OFFICERS—*One Merely Performing Public Duties Required by Public Officer or Agent Under Contract Merely "Employee" or "Independent Contractor."*

But one who merely performs duties required of him by a public officer or a public agent, under contract, though his employment be in doing public work, is not himself a public officer or public agent, but a mere employee; or in some instances an independent contractor.    (p. 261).

6. STATUTES—*Chief Clerk of Secretary of State Held Mere Employee: "Public Officer:" "Public Agent."*

One employed by the Secretary of State, and designated by him as his "chief clerk", but whose position as such is not created by law, and who takes no oath, executes no bond, has no fixed tenure, and performs no duties except such as may be required by the Secretary of State, is not a public officer, or public agent within the meaning of section 8, Article IV of the Constitution, but a mere employee.    (p. 262).

7. STATES—*Portion of Law Attempting Limitation on Amount That Secretary of State May Expend for Clerk Hire Held not Binding.*

Section 3, chapter 87, Acts 1882, insofar as it attempts to place a limitation upon the amount of moneys that may be expended for clerk hire in the office of the Secretary of State, never has been and is not now binding law.    (p. 263).

8. SAME—*Appropriation Bill Passed at Extraordinary Session of Legislature in 1921 Held Budget Bill and not Supplementary Appropriation Bill.*

The appropriation bill passed at the extraordinary session of the Legislature in 1921, was a "Budget Bill' and not a "supplementary Appropriation Bill", under section 51, Article VI of the Constitution, commonly known as the "Budget Amendment."    (p. 265).

9. STATUTES—*Budget Bill Held Constitutional Though not Necessarily Applying to Each Item Embraced Therein.*

The act by which the "Budget Bill" was passed, entitled "An Act making appropriations of public moneys out of the treasury", is constitutional; though such construction does not necessarily apply to each item embraced in the "Budget Bill".    (p. 265).

10. STATES—*Appropriation for Expenses of Secretary of State, Including Compensation of Clerks, Held Valid.*

But the item embraced therein, appropriating the sum of $21,000 "for expenses of Secretary of State's office, including

> compensation of clerks, stenographers and other expenses",
> is sufficiently itemized and classified within the terms of the
> Budget Amendment and therefore a valid appropriation.
> (p. 265).

Mandamus by the State, on the relation of Frances P. Key, against John C. Bond, State Auditor, to require defendant to honor a requisition for the salary of petitioner, as chief clerk in the office of the Secretary of State.

*Writ awarded.*

*John T. Simms,* for relator.

*Geo. E. Price* and *Joseph E. Chilton,* for respondent.

*W. E. R. Byrne,* amicus curiæ.

MEREDITH, JUDGE:

The petitioner, Miss Frances P. Key, who in this proceeding is called the "chief clerk" in the office of the Secretary of State, has applied for a writ of mandamus to require the State Auditor to honor a requisition for her salary for the month of May, 1923. This requisition is shown to have been regularly drawn in her favor by the Secretary of State, upon the Auditor. To the alternative writ heretofore issued by this court, requiring the Auditor to issue his warrant on the State Treasurer for the amount of the requisition, in favor of the petitioner, or show cause why he refuses to do so, the Auditor answers in effect that there is no law authorizing such payment. Various reasons why this is so are urged by him in his return. These will be taken up in their order.

. The first reason assigned is that petitioner is a public officer or agent and that her salary has not been fixed by any general law passed by the Legislature, as required by section 8, Article IV of the Constitution, which reads as follows:

> "The Legislature, in cases not provided for in this Constitution, shall prescribe by general laws, the terms of office, powers, duties and compensation of all public officers and agents, and the manner in which they shall be elected, appointed or removed."

It may be admitted that there is no general law fixing a. specific salary to be paid the petitioner or to be paid to the

person who performs the duties of her position. If she is a "public officer" or "agent" within the meaning of the constitutional provision, her term of office or agency, her powers, duties and compensation have not been fixed by general law. We find no law specifically or generally creating the office or agency of chief clerk to the Secretary of State; nor is there any such provision for her election, appointment or removal. It therefore becomes necessary to inquire whether, within the meaning of that provision, she is a "public officer" or "agent." If she is a public officer or a public agent, and within the terms of this provision, then no matter how valuable her services may have been, she can not enforce payment out of the public treasury, since the "term of office, powers, duties and compensation" have not been fixed by law, and no payment can be made from the treasury unless it is authorized by law. But to be a public officer there must be a public office. We find no provision in the law creating the office of "chief clerk" to the secretary of state. If there be such, astute counsel have overlooked it. The Secretary of State is not authorized to create it. The character of an office can not be attached to a position by name merely. Whether it be an office or not, depends upon the nature and character of the duties attached to it by law. *State* v. *Jennings,* 57 Ohio St. 415. Now what are the facts shown in the instant case? The petitioner is a capable, efficient and faithful clerk, employed by the Secretary of State, in his office. It may be, as alleged in respondent's return, that, under his supervision and direction, she has many responsible duties; that she has in her immediate custody the Great Seal of the State of West Virginia and affixes it to official papers, charters and other documents issued by the state; yet all these things if done by her, are under the immediate direction and control of the Secretary of State; her acts are his acts. They are not done independently of his will, but in accord with his will. A case very much in point is that of *Throop* v. *Langdon,* 40 Mich. 673. It was claimed there that a "chief clerk" to an assessor was a public officer. Judge COOLEY, in writing the unanimous opinion of the court, holding that he was not an officer, said:

"A person has been appointed, and has acted under the designation of chief clerk, but no statute or ordinance has given him that title, and if he were now to be called and to style himself in the discharge of his duties head clerk, or leading clerk, or assistant to the assessor, or assessor's amanuensis, it would, for aught we can discover, be equally well, for nothing depends upon the name. * * * His duties are those of a 'mere clerkship, and consist of writing out and copying the annual assessment rolls of the city from minutes and field notes furnished by the assessor and his assistants, and also special assessment rolls,' and he is distinguished from the other clerks in the office in that 'he gives out and divides the work among the other clerks, and superintends the work for the purpose of making the work systematic and efficient, and of having it properly performed.' Surely these can not be called official functions; they are properly described as those of a mere clerk, and a mere clerk is not an officer. But the duties, such as they are, can be changed at the will of the superior, since no rule of law or well defined custom forbids it. The assessor may distribute his own work and oversee it himself, and if he were to restrict the clerk, now called the chief clerk, to some particular class of duties without making others subordinate to him, we can not see that the incumbent would have any legal ground of complaint. The law has put nobody under the chief clerk, and the title is as applicable to the assessor's confidential assistant, who is 'chief' because of the special confidence reposed, as it is to one who is 'chief' because of having a certain authority over others. The word 'chief,' in other words, defines no duties, and the title 'clerk' is properly that of an employee."

But our own decisions, binding on us, are to the same effect. In *Heath* v. *Johnson,* 36 W. Va. 782, 15 S. E. 980, we held that the occupation of a teacher of a free school in this state is not a public office, but an employment; and in *Hartigan* v. *Board of Regents,* 49 W. Va., 14, 38 S. E. 698, that a professor in our state university is not a public officer. Judge Brannon, in his opinion in that case, did not carry into the syllabus his definition of "public office," partly because the words are used in so many different senses that it is practically impossible to give a precise definition which will accu-

rately cover all cases. However, he did quote with approval section 4 of Mechem on Offices and Officers, as follows:

> "The most important characteristic which distinguishes an office from an employment or contract is, that the creation or conferring of an office involves a delegation to the individual of some of the sovereign functions of government, to be exercised by him for the benefit of the public; that some portion of the sovereignty of the country, either legislative, executive or judicial, attaches, for the time being, to be exercised for the public benefit. Unless the powers conferred are of this nature, the individual is not a public officer"; and he adds: "It at once struck me in reading the wilderness of the law upon the simple but difficult question, what is a public officer? that the requirement to make one a public officer he should exercise something that can fitly be called a part of the sovereignty of the state, was a test."

We think this view is sustained by the great weight of authority. As a general rule it may be stated that a position is a public office when it is created by law, with duties cast on the incumbent which involve an exercise of some portion of the sovereign power and in the performance of which the public is concerned, and which are continuing in their nature and not occasional or intermittent. But one who merely performs the duties required of him by persons employing him under an express or implied contract, though such persons themselves be public officers, and though the employment be in or about public work or business, is a mere employee. In addition to the authorities cited by Judge BRANNON in the Hartigan case for this proposition, we cite the following: *Sanders* v. *Belue,* 78 S. C. 171, 58 S. E. 762; *Rhoden* v. *Johnston,* 121 Ark. 317, 181 S. W. 128; *Sibley* v. *State,* 89 Conn. 682, 96 Atl. 161; *Fergus* v. *Russel,* 270 Ill. 304, 110 N. E. 130, Ann. Cas. 1916-B, 1120; *Jones* v. *Botkin,* 92 Kan. 242, 139 Pac. 1196; *Bankers' Surety Co.* v. *Newport,* 162 Ky. 473, 172 S. W. 940; *State Tax Com'r.* v. *Harrington,* 126 Md. 157, 94 Atl. 537; *Blynn* v. *Pontiac,* 185 Mich. 35, 151 N. W. 681; *Sullivan* v. *McOsker,* 84 N. J. L. 380, 86 Atl. 497; *Bilger* v. *State,* 63 Wash. 457, 116 Pac. 19.

Now it can not be said that because the petitioner, under

the direction of the Secretary of State, affixes the Great Seal of the State to official documents, this is her act and that therefore she exercises a portion of the sovereign power of the state. She exercises no independent power or authority. What she does she does not in her own name and by virtue of her own authority, but in his name. Her duties are not prescribed by law; they are prescribed by the Secretary of State, and he may change them when he sees fit. She takes no oath; gives no bond; has no tenure fixed by law; hence we must hold that she is not a public officer.

But respondent says that if she is not a public officer she is a public agent, and therefore within the terms of the constitutional provision. 1 Mechem, Agency, §25 says that the word "agency," when used in its broad sense, indicates the relation which exists when one person is employed to act for another. "In this aspect, it has in our modern law, three chief forms: 1. The relation of principal and agent; 2. The relation of master and servant, or in the more modern phrase, the relation of employer and employee; and 3. The relation of employer or proprietor and independent contractor." Now in what sense is the term "agent" used in the constitutional provision? Is it possible that the framers of the constitution meant to say that the Legislaure should prescribe, by general laws, the terms of office, powers, duties and compensation of all persons who may do work for the state? Does this word "agents" include mere employees and independent contractors, those placed by Mechem in his second and third classifications, or is its meaning restricted to the first class? If the second class are included, then every charwoman who cleans the floors of a building belonging to the state or its agencies, every painter, carpenter, bricklayer, hod-carrier, wireman, or workman of any character upon any such building or project, of whatever sort, would be a public agent and the Legislature would be bound by general law, not only to prescribe their powers, duties and compensation, but also their terms of office. This provision means that the agent fills an office just as clearly as that an officer fills an office. Each has an "office," whose term must be prescribed by law. Examples might be multi-

plied indefinitely. But a mere statement of the proposition shows the absurdity of the proposition that every employee of the state is an agent of the state. The words "public agents," and we use the two together because the context shows that they are to be so used and' read, as used in the constitution, means those persons who are agents in the narrower and proper sense of the term. In that sense they imply the relation of principal and agent. That relation "is the legal relation which exists where one person, called the agent, is authorized usually by the act of the parties, but occasionally perhaps by operation of law, to represent and act for another, called the principal, in the contractual dealings of the latter with third persons. The distinguishing features of the agent may briefly be said to be his representative character and his derivative authority." 1 Mechem, Agency, §26; *Merriman Company* v. *Thomas & Co.,* 103 Va. 26, 48 S. E. 490.

Again, in pointing out the difference between an agent and a servant, 1 Mechen, Agency,, §36, says:

> "The characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons. To the proper performance of his functions, therefore, it is absolutely essential that there shall be third persons in contemplation between whom and the principal the legal obligations are to be thus created, modified, or otherwise affected by the acts of the agent."
>
> "The function of the servant, on the other hand, as his name suggests, is the rendition of service,—not the creation of contractual obligations. He executes the commands of his master, chiefly in reference to things, but occasionally with reference to persons when no contractual obligation is to result."

Now it is clear that the petitioner in no sense negotiates contractual obligations for and on behalf of the state. She is therefore not an agent, but a mere servant or employee. But why was the term agent used in the Constitution? The framers knew that certain offices were created by the Consti-

tution; that other offices would be created by the Legislature or under its authority as the needs of the state might require; they also knew that, from time to time, the state would need the services of persons for special missions, for temporary but special purposes,—of persons who for a time would be vested with a portion of sovereign power, like an officer, with authority to represent and bind the state in contractual relations with third persons; but, who, on account of the temporary character of their employment could not properly be termed officers, although they would execute official duties. We have seen that a public office generally involves the continuous exercise of power; not occasional or intermittent. For example, it is provided that the Auditor may, with the approval of the Governor, appoint agents to superintend the collection of claims due the state; or to sell lands belonging to the state. Barnes' Code, 1923, ch. 35, secs. 22, 26. Many other instances might be given. The agents so appointed represent a portion of sovereign power, with authority to enter into binding contractual obligations on behalf of their principal. The petitioner in this case represents no such power. By her own authority she can not and does not bind the state in any contractual obligation and therefore she is not an agent.

2. The second ground urged by respondent is that even if the petitioner is a mere employee or clerk, yet she can not be paid her salary because the amount limited for payment of clerk hire in the office of the Secretary of State, under section 3, chapter 87, Acts 1882, chapter 11, Barnes' Code, 1923, has been exhausted. It provides that the Secretary of State may, at his discretion, annually expend not exceeding the sum of $1100 for necessary clerk hire. It is contended by petitioner that this never was law; that if it ever was law, it is not law now because it has been repealed. To discuss this phase of the case, it is necessary to review, as briefly as possible, the course of subsequent legislative action touching the amounts allowed for clerk hire in the office of the Secretary of State.

Section 3, was passed March 23, 1882, and if it ever became operative as law, went into effect ninety days after its passage. Bearing in mind that it limits the amount that

may be expended for clerk hire in the Secretary of State's office to $1100, we find that the Legislature, on March 25, 1882, passed, and the Governor on March 27, 1882, approved, the general appropriation bill, which act took effect from its passage by vote of two-thirds of the members of each house; that by that act there was appropriated ''To pay salary of clerk to Secretary of State'' $1200. Clearly, the later law governed and authorized the expenditure of $1200 for clerk hire instead of $1100. It at least suspended the operation of the earlier act. What about the subsequent course? We find that the appropriations for clerk hire for this office, varying somewhat in language in the various acts, but covering hire of clerks and stenographers, have been as follows: 1883, $1200; 1885, $1200; 1887, $1200; 1889, $1200; 1891, $1400; 1893, $1400; 1895, $1400; 1897, $1400; 1899, $4200; 1901, $4500; 1903, $6700; 1905, $7864; 1907, $8260; 1909, $11600; 1911, $11300; 1913, $13600; 1915, $12600; 1917, chief clerk, $2400, clerk of Board of Public Works $2100, corporation clerk $1800, other clerks $7700; 1919, for expenses of office, including clerks, stenographers and other expenses, $17000; 1921, ''Expenses of Secretary of State's office, including compensation of clerks, stenographers and other expenses, $21000.''

We see from the foregoing that there never has been a year from the date of the passage of the limitation in section 3, chapter 87, Acts 1882, in which the moneys appropriated for clerk hire in the Secretary of State's office have not exceeded the limit of $1100.

Section 3, as already stated, did not become effective until ninety days from its passage; but before that date had arrived, the Legislature by a subsequent act suspended its operation; it did not therefore become effective within ninety days from its passage. And each succeeding Legislature passed acts appropriating moneys in excess of the limit of section 3, so that it never has been in effect for a single moment from the date of its passage down to this date. It was a still-born child and has never been revived. The whole tenor of the subsequent acts of the Legislature has been not only inconsistent with but repugnant to it. Both

could not be law. No citation of authority is necessary for the proposition that where two acts of the Legislature, covering the same subject matter, are irreconcilably inconsistent, the later act repeals the former. If the former needed repeal, the later acts rendered it ineffective. It never was effective law and is not now. As suggested in argument, there is strong ground for holding section 3 void as being contrary to section 3, Article X of the Constitution, which provides that "No money shall be drawn from the treasury but in pursuance of an appropriation made by law"; but we find it unnecessary to pass upon that proposition. We therefore hold that the so-called act of 1882 is no bar to petitioner's right to her salary.

3. A third ground of refusal to pay is that the sum of $21000 appropriated in 1921 for the fiscal year ending June 30, 1923, for "expenses of secretary of state's office, including compensation of clerks, stenographers and other expenses," is unconstitutional and void, because: (1) the sum is not itemized in accordance with section 51, Article VI of the Constitution, known as the "Budget Amendment"; (2) because the entire appropriation act of 1921 violates section 30, Article VI of the Constitution, which provides that no act thereafter passed shall embrace more than one object; and (3) that it violates section 38 of Article VI, which provides that the salary of any public officer shall not be increased or diminished during his term of office.

The Budget Amendment was adopted by popular vote in 1918; the first general appropriation bill passed under its provisions was that of 1919, and the second was that of 1921, the one now under consideration. Time and space will not permit a discussion of the purposes of the amendment, nor the reasons which brought about its adoption. It is sufficient to say that it is now a part of the fundamental law of the state, and all of us are bound by it. It is long and complicated; many of its provisions need not be reviewed to determine the question before us, and we desire to confine ourselves to the one question now to be determined,—namely: Is the act by which the general appropriation bill of 1921 was passed in accord with this amendment, and in par-

ticular, is the item of $21000 appropriated for expenses in
the Secretary of State's office in accord with it? The amend-
ment distinctly provides that if any item of the appropria-
tion bill shall be held invalid, such invalidity shall not affect
the legality of the bill or of any other item of the bill. The
parts of the amendment germane to the present question are:

"The Legislature shall not appropriate any money
out of the treasury except in accordance with the fol-
lowing provisions:

*Subsection A.*—Every appropriation bill shall be
either a budget bill, or a supplementary appropria-
tion bill, as hereinafter mentioned.

*Subsection B.*—*First.* Within ten days after the
convening of the Legislature, unless such time shall
be extended by the Legislature for the session at
which the budget is to be submitted, the board of
public works, which shall consist of the Governor, Sec-
retary of State, Auditor, Treasurer, Attorney General,
Superintendent of Free Schools and Commissioner of
Agriculture, shall submit to the Legislature, two
budgets, one for each of the ensuing fiscal years.
Each budget shall contain a complete plan of pro-
posed expenditures and estimated revenues for the
particular fiscal year to which it relates; and shall
show the estimated surplus or deficit of revenues at
the end of each year. Accompanying each budget
shall be a statement showing: (1) the revenues and
expenditures for each of the two fiscal years next
preceding; (2) the current assets, liabilities, reserves
and surplus or deficit of the State; (3) the debts and
funds of the State; (4) an estimate of the State's
financial condition as of the beginning and end of
each of the fiscal years covered by the two budgets
above provided; (5) any explanation the board of
public works may desire to make as to the important
features of any budget and any suggestion as to
methods for the reduction or increase of the State's
revenue.

*Second.* Each budget shall be divided into two
parts, and the first part shall be designated "Govern-
mental Appropriations" and shall embrace an item-
ized estimate of the appropriations: (1) for the
Legislature as certified to the board of public works
in the manner hereinafter provided; (2) for the
executive department; (3) for the judiciary depart-

ment, as provided by law, certified to the Governor
by the Auditor; (4) to pay and discharge the prin-
cipal and interest of any debt of the State of West
Virginia hereafter created in conformity with the
Constitution, and all laws enacted in pursuance
thereof; (5) for the salaries payable by the State
under the Constitution and laws of the State; (6) for
the aid of public schools in conformity with the laws
of the State; (7) for such other purposes as are set
forth in the Constitution and laws made in pursuance
thereof.

*Third.* The second part shall be designated ''Gen-
eral Appropriations,'' and shall include all other
estimates of appropriations.

The board of public works shall deliver to the pre-
siding officer of each House the budgets and a bill
for all the proposed appropriations of the budgets
clearly itemized and classified; and the presiding
officer of each House shall promptly cause said bill to
be introduced therein, and such bill shall be known
as the 'Budget Bill.' The board of public works
may, before final action thereon by the Legislature,
amend or supplement either of said budgets to correct
an oversight or in case of an emergency, with the con-
sent of the Legislature by delivering such an amend-
ment or supplement to the presiding officers of both
Houses; and such amendment or supplement shall
thereby become a part of said budget bill as an ad-
dition to the items of said bill or as a modification
of or a substitute for any item of said bill such amend-
ment or supplement may affect.

The Legislature shall not amend the budget bill so
as to create a deficit but may amend the bill by in-
creasing or diminishing the items therein relating to
the Legislature, and by increasing the items therein
relating to the judiciary, but except as hereinbefore
specified, may not alter the said bill except to strike
out or reduce items therein; *provided, however,* that
the salary or compensation of any public officer shall
not be increased or diminished during his term of
office; and such bill when and as passed by both
Houses shall be a law immediately without further
action by the Governor.

*Fourth.* The Governor and such representatives
of the boards, officers and commissions of the State
expending or applying for State's money as have been
designated by the Board of Public Works for this
purpose, shall have the right, and when requested by

either House of the Legislature it shall be their duty to appear and be heard with respect to any budget bill during the consideration thereof, and to answer inquiries relative thereto.''

Sub-section C covers supplementary appropriation bills; as the bill under consideration does not come within that category, it is unnecessary to quote that provision.

> "*Sub-section D, general provisions.—First.* If the 'Budget Bill' shall not have been finally acted upon by the Legislature three days before the expiration of its regular session, the Governor may, and it shall be ·his duty to issue a proclamation extending the session for such further period as may, in his judgment, be necessary for the passage of such bill; but no other matter than such bill shall be considered during such extended session except a provision for the cost thereof.
>
> *Second.* The Board of Public Works for the purpose of making up its budgets shall have the power, and it shall be its duty, to require from the proper State officials, including herein all executive departments, all executive and administrative officers, bureaus, boards, commissions and agencies expending or supervising the expenditure of, and all institutions applying for State moneys and appropriations, such itemized estimates and other information, in such form and at such times as said board shall direct. The estimates for the legislative department, certified by the presiding officer of each House, of the judiciary, as provided by law, certified by the Auditor, and for the public schools, as provided by law, shall be transmitted to the Board of Public Works, in such form and at such time as it shall direct, and shall be included in the budget.
>
> The Board ·of Public Works may provide for public hearings on all estimates and may require the attendance at such hearings of representatives of all agencies, and all institutions applying for state moneys. After such public hearings it may, in its discretion, revise all estimates except those for the legislative and judiciary departments, and for the public schools as provided by law.''

The fourth paragraph of sub-section D provides that ,"nothing herein shall be construed as preventing the Gov-

ernor from calling extraordinary sessions of the Legislature, as provided by section seven of article seven'' of the Constitution. Under the last mentioned provision, the Legislature was called in extra session, at which the act in question was passed.

The Act is entitled: ''An Act making appropriations of public moneys out of the treasury, in accordance with the provisions of the Constitution of the State of West Virginia.'' The bill which was passed was a budget bill, not a supplementary appropriation bill; it was prepared and delivered by the board of public works to the presiding officers of the two houses of the Legislature. Accompanying the bill were the two budgets, one for each of the ensuing fiscal years. The budget was arranged so as to show in parallel columns opposite each of the purposes for which the money was appropriated by the ''Budget Bill'': First, the amount actually expended for the year ending June 30, 1920; Second, the amount authorized to be expended for the year ending June 30, 1921; Third, the amount of appropriation carried by the ''Budget Bill'' for the year ending June 30, 1922; Fourth, the amount of appropriation carried by the ''Budget Bill'' for the year ending June 30, 1923. The budget was also supplemented by the sixth annual report audit of the finances of the state, published by the Department of the State Tax Commissioner as required by law and appropriate references thereto by page number in the Budget. This report, which showed in detail the purposes for which the moneys were actually expended for the year ending June 30, 1920, together with general explanations of the financial transactions of the state, was transmitted with the Budget; so that the members of each house could by ready reference from the one to the other ascertain the amounts actually expended for the preceding fiscal year, by any department, and the detailed purposes for which they were spent. For example, when we turn to page 29 of the Budget, showing the estimated amounts required for the two fiscal years 1922 and 1923 for expenses for the Secretary of State's office, we find the estimate for each year of these years is $21000; these estimates are in the two right hand columns,

under their appropriate years. To the left, on the same page, are the columns showing the appropriations made for 1920 and 1921; to the left of these is the number 70, which refers to the page in the report of the Department of the State Tax Commissioner heretofore mentioned. When we turn to page 70 of this report, we find there a complete list of every item of expense incurred by the Secretary of State; if paid to an employee, the name and amount of salary to each; other expenses are itemized, showing for what they were incurred and the several amounts. This report covers the amounts actually expended during the fiscal year ending June 30, 1920; it could not cover those for the following year, because the year had not then ended. Now as we understand the objection to the appropriation, it is to the effect that the different items which were estimated to make up the amount appropriated in the bill, that is in this particular instance, the sum of $21000, should also be shown in the bill itself, and that since they are not so shown the appropriation is void. Of course, those covering ''postage,'' ''telephone,'' ''telegraph,'' ''drinking water and cups,'' ''office supplies'' and other incidental or contingent expenses, could not be estimated with much accuracy; some of the items for salaries, perhaps, could; other items for extra help might or might not; as to these matters the various members of the Board of Public Works, and the members of both houses of the Legislature are better advised than we are. Whether it be wise or not to tie down a departmental head to specific sums to be expended for specific and minute items is for the Legislature, not for us, to say. The Legislature declares public policy, not the courts. But because the bill itself does not carry on its face the detailed items for which the moneys may be expended and the specific sum for each item, must we say that the item of $21000 is void? The Legislature can not be presumed to have acted blindly. It had before it not only the Budget Bill and the Budget, but also the financial report of the finances of the State referred to. In addition to this, under the provisions of the amendment itself either house may call before it or its appropriate committees any officer, representative of boards or

commissions expending or applying for appropriations and to answer inquiries relating thereto. Again, section 13-A, chapter 11, Barnes' Code, 1923, requires each officer, employee, head of a department or of an institution or of a board to which appropriation or allowance is made for clerk hire, pay of assistants or of stenographers, to give in their biennial report to the Governor for transmission to the Legislature, the name of each of such clerks, assistants or stenographers employed by them, the amount paid to each, (except where temporarily employed) the rate per month of such payment; also a fully itemized statement of every expense, to whom paid and for what purpose. All this information each house is presumed to have had; so that there could be no possible reason why each house was not fully advised of the needs of the Secretary of State's office or of any department when the appropriation bill was under consideration. Every member had access to the information and we must presume he availed himself of his privilege. Now when we examine the appropriation bill, we find its totals run into millions of dollars; it undertakes to take care of the three departments of government, the legislative, executive and judicial, in fact, the whole government for the period of two years. It covers expenditures for our educational institutions, the state university, normal schools, and other schools, asylums and numerous other institutions and agencies. When we look to the items of the bill, we find for the fiscal year ending June 30, 1923, there was appropriated for the state university for ''salaries of officers, teachers and employees, $425,000; for current general expenses $150,000''; the appropriations for the normal schools are made in like manner; to supplement the general school fund to pay part of the increase in teachers' salaries and supervisors and state aid for standardized high schools, $1,000,000; these are but instances. There is nothing showing what salary each professor or instructor in the state university shall receive; yet, if the $21000 item for the Secretary of State's office is void, because not minutely itemized, so are those mentioned, including many others not mentioned. Not a single professor or instructor in any institu-

tion could receive payment of his salary out of the state treasury, if the appropriation for that purpose must be itemized as claimed by respondent. The current general expenses of running our asylums could not be paid; all such appropriations would be void. And yet, when we look back over the former appropriation bills, those made before the passage of the Budget Amendment, we find they run the same way. This system is not new. It has been followed for years. Does the Budget Amendment change all this? If so, by what words? Its third paragraph of sub-section B says: ''The board of public works shall deliver to the presiding officer of each House the budgets and a bill for all the proposed appropriations of the budgets *clearly itemized and classified.*'' It does not say minutely itemized, but ''clearly itemized and classified.'' We can not believe that this means every item of proposed expenditures must be set out in detail in the appropriation `bill; this would carry analysis too far. We are told in 23 Cyc. 371, that ''Item'' is a ''word' of varied meaning; according to the standard lexicographers, it may mean an article; a circumstance, a driblet, a part; a separate particular of an account, the particulars of an account, or a single item of an account, or a thing in the aggregate composed of several single things.'' But the word ''itemize'' as used in the Constitution is used in relation to the subject of appropriations; it deals with large sums, not mere ''driblets''; these sums are to be classified under their appropriate heads, and being so classified, should be reasonably itemized, having in view the amounts to be appropriated and the objects to be accomplished. Those charged with the preparation of the appropriation bill, the members of the Board of Public Works, and the members of the Legislature who finally vote the appropriations, are fully competent to deal with the subject and to determine how closely detailed the various sums appropriated shall be analyzed. When the Legislature passed the bill carrying the sum of $21000 ''for expenses of secretary of state's office, including compensation of clerks, stenographers and other expenses,'' it was satisfied with the necessity and wisdom of the appropriation; and we have no hesitation in saying that this is **a**

sufficient itemization and classification under the Budget Amendment.

Upon the other two points raised as to the constitutionality of the act, little need be said. The requirement, under section 30, Article VI of the Constitution, which provides that no act thereafter passed shall embrace more than one object, has no application to appropriation bills. These are provided for under the Budget Amendment. The remaining point, that section 38 of Article VI which provides that the salary of any public officer shall not be increased or diminished during his term of office is no objection. The petitioner is not a public officer. It does not apply, if this objection refers to the Secretary of State, because he receives no part of the $21000 appropriated.

Peremptory writ awarded.

*Writ awarded.*