510 S.E.2d 764

STATE of West Virginia ex rel. Hanley C. CLARK, Insurance Commissioner of the State of West Virginia, Plaintiff Below, Appellee,

v.

BLUE CROSS BLUE SHIELD OF WEST VIRGINIA, INC., Defendant Below, ·

West Virginia State Medical Association, Intervenor Below, Appellee,

West Virginia Hospital Association; Blue Cross Western Pennsylvania; International Union; United Mine Workers; and Joann Williams, et al., Intervenors Below,

Pennsylvania Blue Shield, Intervenor Below, Appellant.

State of West Virginia ex rel. Hanley C. Clark, Insurance Commissioner of the State of West Virginia, Plaintiff Below, Appellee,

v.

Blue Cross Blue Shield of West Virginia, Inc., Defendant Below,

West Virginia State Medical Association, Intervenor Below, Intervenor, Appellee,

West Virginia Hospital Association; Pennsylvania Blue Shield; International Union; United Mine Workers; and Joann Williams, et al., Intervenors Below,

Blue Cross Western Pennsylvania, Intervenor Below, Appellant.

State of West Virginia ex rel. Hanley C. Clark, Insurance Commissioner of the State of West Virginia, Plaintiff Below, Appellee,

v.

Blue Cross Blue Shield of West Virginia, Inc., Defendant Below,

West Virginia State Medical Association, Intervenor Below, Intervenor, Appellee,

West Virginia Hospital Association; Blue Cross Western Pennsylvania; Pennsyl-

vania Blue Shield; International Union; United Mine Workers; and Joann Williams, et al., Intervenors Below,

United States of America, on Behalf of CHAMPUS, Department of Veterans Affairs—Va Hospitals, Department of Defense, Department of Health and Human Services, Office of Personnel Management and Medicaid, et al., Claimant Below, Appellant.

Nos. 24625–24627.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 23, 1998.

Decided Dec. 4, 1998.

James A. McKowen, James F. Humphreys & Associates, Charleston, West Virginia, Edward L. Springer, Gerri L. Sperling, James H. Webster, Springer, Bush & Perry, Pittsburgh, Pennsylvania, Attorneys for the Appellants, Highmark, Inc. (formerly Pennsylvania Blue Shield, and Blue Cross of Western Pennsylvania).

Frank W. Hunger, Assistant United States Attorney General, Rebecca A. Betts, United States Attorney, Southern District of West Virginia, Charleston, West Virginia, Stephen M. Horn, Assistant United States Attorney, J. Christopher Kohn, Sandra P. Spooner, Mary R. Bohan, Department of Justice, Washington, District of Columbia, Attorneys for the Appellant, The United States of America.

John T. Miesner, Hoyer, Hoyer, Smith & Miesner, Robert L. Greer, Assistant Deputy Receiver, West Virginia Department of Insurance, B. Keith Huffman, Office of the Insurance Commissioner, Charles R. McElwee, Paul G. Papadopoulos, Robinson & McElwee, Charleston, West Virginia, Attorneys for the Appellee, Hanley C. Clark, Insurance Commissioner of the State of West Virginia.

Steven L. Thomas, Kay, Casto, Chaney, Love & Wise, Charleston, West Virginia, Attorney for the Intervenor, Appellee, West Virginia State Medical Association.

Michael E. Surguine, Kansas City, Missouri, Ancil G. Ramey, Steptoe & Johnson, Charleston, West Virginia, Attorneys for Amicus Curiae, National Association of Insurance Commissioners.

F. James Foley, Vorys, Sater, Seymour and Pease, Columbus, Ohio, Cheryl Connelly,

Dustin C. Haley, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, West Virginia, Attorneys for Amici Curiae, National Organization of Life & Health Insurance Guaranty Associations and National Conference of Insurance Guaranty Funds.

DAVIS, Chief Justice:

In three appeals consolidated for purposes of rendering this opinion, Pennsylvania Blue Shield [hereinafter "PBS"], Blue Cross of Western Pennsylvania [hereinafter "BCWP"] and the United States of America [hereinafter "the United States"] challenge orders entered by the Circuit Court of Kanawha County in liquidation proceedings involving Blue Cross Blue Shield of West Virginia [hereinafter "BCBSWV"]. PBS and BCWP raise various issues, however, each complain that it did not receive adequate notice of the recommended decision of the court-appointed Referee regarding its respective claim, which decisions were adopted by the circuit court without a hearing. We find this issue is dispositive of the appeals of these two companies. Based upon our conclusion that the lower court failed to follow the mandatory directives of W. Va.Code § 33–24–25 (1990) (Repl.Vol.1996), we remand these two cases for additional proceedings consistent with that governing statute. In the third appeal herein consolidated, the United States first argues that the Receiver improperly applied state law and classified its late-filed proofs of claim in Class VII for purposes of distributing the BCBSWV liquidated estate. We find that the West Virginia priority scheme for late-filed claims, as expressed in W. Va.Code §§ 33–24–27(g) (1996) (Supp.1998) and 33–24–37(b) (1990) (Repl.Vol.1996), does not exceed state power, and furthermore, under the McCarran–Ferguson Act, 15 U.S.C. §§ 1011 et seq., W. Va.Code § 33–24–27 reverse preempts the federal priority statute asserted by the United States. Therefore, the classification assigned by the Receiver to the late-filed claims of the United States, which

was subsequently adopted by the circuit court, was correct. Finally, the United States contends that the circuit court erred in finding that BCBSWV was not party to a contract entered between the Office of Personnel Management and the Blue Cross Blue Shield Association. We find that the Blue Cross Blue Shield Association acted as an agent for BCBSWV when it entered the contract. Therefore, the order appealed by the United States is affirmed in part, reversed in part, and remanded for further proceedings.

## I.

### STATEMENT OF FACTS

This case pertains to liquidation proceedings involving BCBSWV. By an "ORDER OF LIQUIDATION AND INJUNCTION" entered in the Circuit Court of Kanawha County on October 26, 1990, BCBSWV was placed into receivership. Hanley C. Clark, Insurance Commissioner of the State of West Virginia, was named as Receiver.

Three separate appeals have been filed in this Court challenging certain aspects of the BCBSWV liquidation proceedings below. The three parties appealing are PBS,[1] BCWP[2] and the United States. Because these appeals all relate to the BCBSWV liquidation proceedings, we have consolidated them for the purpose of rendering this opinion. However, the facts relevant to the appeals of PBS and BCWP differ from those relevant to the appeal of the United States. Therefore, we first relate the facts relevant to the appeals of PBS and BCWP. The facts pertaining to the appeal of the United States are reviewed thereafter.

### A

#### Pennsylvania Blue Shield and Blue Cross of Western Pennsylvania

The facts relevant to the appeals of PBS and BCWP are similar, and are described

---

1. Highmark, Inc., appears before this Court as successor-in-interest to Pennsylvania Blue Shield. However, for clarity and ease of reference, we will refer to this appellant as Pennsylvania Blue Shield or PBS.

2. Highmark, Inc., also appears before this Court as successor-in-interest to Blue Cross of Western Pennsylvania. For clarity and ease of reference, we will similarly refer to this appellant as Blue Cross of Western Pennsylvania or BCWP.

together in this section of the opinion. Appellants PBS and BCWP, and the appellee BCBSWV, are all members of the Blue Cross and Blue Shield Association [hereinafter "the Association"], a national organization to which all Blue Cross and Blue Shield plans belong.

The Association oversees the national system of Blue Cross Blue Shield plans. According to the parties, regional "Blue" plans interact with each other to provide, *inter alia,* health insurance coverage and claims servicing across state lines. This interaction is necessary to accommodate employer-subscribers having employees in two or more states. These employer-subscribers, who must interact with two or more "Blue" plans in order to provide health insurance for their employees, are referred to as "National Accounts."

At the time liquidation of BCBSWV was ordered, agreements were in place between BCBSWV and PBS, and between BCBSWV and BCWP, to administer health claim benefits for various National Accounts. In connection with these agreements, PBS and BCWP made certain payments, referred to as "advance deposits," to BCBSWV.[3]

After BCBSWV was placed into receivership, the Receiver took control of its assets and liabilities (the liquidation estate) pursuant to W. Va.Code § 33–24–1 *et seq.* In accordance with the statutory requirements, and after consultation with certain potential claimants, the Receiver filed a liquidation plan in the circuit court. The court approved the plan, which included a procedure whereby parties holding claims against the liquidated estate could assert them by filing proofs of claim. Pursuant to the court-approved plan, proofs of claim would be reviewed by the Receiver, who would then issue notices of determination to each claimant. Thereafter, the claimants could submit objections for resolution by a court-appointed referee.[4]

In accordance with the court-approved procedure, PBS and BCWP each filed a proof of claim in which they sought to recover the amount of their advance deposits. In addition, PBS's proof of claim sought $77,-224.02 for payments made to Pennsylvania health care providers for the satisfaction of obligations incurred by BCBSWV, and $47,-153.70 as reimbursement for funds made available by PBS to cover dishonored health care claims payment checks issued by BCBSWV.

The Receiver made his determinations regarding the proofs of claim filed by PBS and BCWP, and sent each company a notice of determination. The notices revealed that the Receiver had effectively categorized PBS's and BCWP's claims as Priority Class V, under W. Va.Code § 33–24–27 (1996) (Supp. 1998),[5] for purposes of payment. The two companies timely filed objections to the Receiver's determinations. The disputed claims were then referred to a court-appointed Referee.

Presumably to assist in the management of the numerous disputed claims to be addressed by the Referee, the circuit judge, by order entered June 16, 1993, adopted specific rules to guide the proceedings before the Referee. These rules were titled "CLAIMANTS' RULES OF PROCEDURE BEFORE REFEREE" [hereinafter "Claimants' Rules"]. The circuit court order adopting the Claimants' Rules stated that they "shall

---

3. The parties dispute the nature of these advance deposits and the priority classification assigned to them by the Receiver for purposes of liquidation.

4. See W. Va.Code § 33–24–25 (1990) (Repl.Vol. 1996) for the statutory requirements for processing proofs of claims.

5. The Receiver actually, and properly, applied the statute in effect at the time of his decision, W. Va.Code § 33–24–27 (1990) (Repl.Vol.1996). Under this version of the statute, the category assigned to the claims of PBS and BCWP was Priority Class IV. However, following the issuance of the Receiver's notices of determination to PBS and BCWP, W. Va.Code § 33–24–27 was amended. The amended statute became effective on March 9, 1996, and was made to apply retrospectively to "all claims filed in any proceeding to liquidate a corporation which [were] pending on the effective date of this section ...." For the sake of clarity and to avoid confusion, throughout this opinion all references to classifications assigned by the Receiver are translated into the associated classification under the revised version of W. Va.Code § 33–24–27, unless otherwise noted.

govern all proceedings and hearings to be held before the Court appointed Referee pursuant to the Amended Reference Order entered by the Court on March 12, 1993."

Pursuant to the Claimants' Rules, the Referee conducted hearings regarding the disputed claims of PBS and BCWP and, sometime thereafter, rendered a recommended order in each case. Each recommended order advised the circuit court to reject the objections to the Receiver's determinations made by PBS and BCWP.

The Claimants' Rules required notice to the "parties of record" when the Referee's recommended order was filed in the circuit court. The relevant portion of the rules states: "The original of the Recommended Order will be filed with the Circuit Clerk, and notice of the filing will be made to the *parties of record.*" (Emphasis added).

A certificate of service attached to the Referee's recommended order issued in response to the objections filed by PBS indicated that the Referee served copies of his recommended order by U.S. Mail on various local counsel for the interested parties on December 23, 1996. The certificate of service further indicates that copies of the order were not served upon PBS individually or its out-of-state counsel. No objections to the recommended order were subsequently filed in the circuit court. Therefore, the court adopted, in full, the recommended order and entered the same as its final order on January 21, 1997.

A similar course of events occurred with regard to BCWP. The certificate of service attached to the Referee's recommended order issued in response to the objections filed by BCWP revealed that, also on December 23, 1996, the Referee served copies of this recommended order by U.S. Mail on various local counsel for the interested parties. As

with the PBS recommended order, no copies were served upon BCWP individually or its out-of-state counsel. In the absence of any objections to the recommended order, the circuit court adopted the order and entered the same as its final order on January 13, 1997.

PBS and BCWP both claim that they did not receive notice or have knowledge that the Referee had made his recommendations regarding their objections until January 20, 1998. Thus, PBS received notice one day prior to the circuit court's January 21, 1997, entry of its final order denying PBS's objections, and BCWP received notice seven days following the court's January 13, 1997, entry of its final order rejecting BCWP's objections.

As evidenced by the aforementioned certificates of service that were attached to the Referee's recommended decisions, notice regarding the recommended decisions and their submission to the circuit court had been sent to James McKowen, local counsel for PBS and BCWP, at a law firm with which he no longer associated. However, evidence contained in the record indicated that formal notice of McKowen's change of address was not attempted until January 21, 1997, the day after McKowen received notice of the Referee's recommended decisions.[6]

It is from the circuit court's final orders of January 21, 1997, and January 13, 1997, respectively, that PBS and BCWP now appeal to this Court.

### B.

### The United States of America

The appeal of the United States involves claims against the BCBSWV liquidated estate made by three separate agencies of the United States government.[7] While some of

---

6. By letter dated January 21, 1997, McKowen sent notices of his new address to lawyers for the various parties, including counsel for the Receiver. However, the letter does not indicate that it was sent to the circuit court or to the Referee.

7. In its appellate brief, the United States indicated that it was also appealing a claim against the BCBSWV liquidated estate asserted by the Office of Civilian Health and Medical Program of the

Uniformed Services [hereinafter CHAMPUS]. However, the United States has failed to present an argument describing any alleged error involving the circuit court's disposition of the CHAMPUS claim. Moreover, the United States has acknowledged that the Receiver's notice of determination placed the CHAMPUS claim into the equivalent of priority Class II under W. Va.Code § 33–24–27, as amended. *See supra* note 5. As this is the highest class that may be assigned to

the United States' claims involve more than one of the various agencies, the facts with respect to each agency are different. Consequently, the relevant facts are provided separately for each agency. Following the separate statements of fact, we briefly review the procedural history that brought the United States' claims before us. Each of the three issues raised by the United States will be addressed following a discussion of the issues raised by PBS and BCWP.

The following background information pertaining to each of the federal agencies filing claims against the BCBSWV liquidated estate was provided by the United States, and was not disputed by the Receiver.

### 1. Claim of the Department of Veterans Affairs

A number of medical centers operated under the Department of Veterans Affairs [hereinafter "VA"] submitted proofs of claim prior to the deadline for timely filing such claims. Other VA medical centers did not meet the deadline, but filed their proofs of claim after that date. Notices of determination subsequently issued by the Receiver placed timely-filed VA claims into priority Class II under W. Va.Code § 33–24–27, as amended.[8] Late-filed claims were placed into priority Class VII of the amended statute.[9] The dollar amounts of the claims have not yet been quantified.

### 2. Claim of the Health Care Financing Administration

The Health Care Financing Administration [hereinafter "HCFA"] is an agency within the Department of Health and Human Services. The HCFA administers the Medicare program, which provides health insurance for the elderly, disabled and those suffering from end-stage renal disease. In connection with the BCBSWV liquidation proceedings, HCFA filed a proof of claim related to its administration of the Medicare program.

The claim submitted by HCFA had two components.

The first component of HCFA's claim arose from its contract with BCBSWV as an intermediary to process Medicare claims. The United States submits that from 1985 through 1991, BCBSWV contracted with HCFA to act as an intermediary to process and pay Part A Medicare claims, which provide insurance for inpatient institutional services, home health services, and other post-hospital services. During this time, HCFA reimbursed BCBSWV for its administrative costs pursuant to the contract. However, upon completion of its audit, HCFA disallowed a total of $12,962.00 in administrative costs. According to the United States, the Medicare statute and regulations authorize recovery of these overpayments.

Under the Medicare intermediary contract, BCBSWV is also obliged to refund pension assets in excess of actuarial liability when its contract with HCFA is terminated.[10] Medicare made excess pension contributions in the amount of $617,644.00 to cover its pension liability for BCBSWV employees. In addition, $76,799.00 of claimed pension expenses were disallowed by HCFA auditors. Consequently, the United States asserts that the total overpayments, including disallowed administrative payments, excess pension contributions, and disallowed pension expenses, must be refunded to Medicare in full. However, the Receiver's notice of determination gave no separate class determination to this portion of HCFA's claim, nor was the disputed claim submitted to the Referee for adjudication.

The second component of the HCFA's claim arose under the Medicare Secondary Payer [hereinafter "MSP"] statute. *See* 42 U.S.C. § 1395y(b) (1994) (1994 ed.). According to the United States, The MSP statute applies to Medicare beneficiaries who have alternative sources of payment for health care services, including those provided

---

any claimant, priority Class I being reserved for administrative expenses, we conclude that the United States has failed to designate an error in connection with the CHAMPUS claim.

**8.** *See supra* note 5.

**9.** *See supra* note 5.

**10.** Presumably, the contract between BCBSWV and HCFA was terminated when BCBSWV was placed into receivership.

through private insurers like BCBSWV. Where an alternative source of payment exists, the MSP statute mandates that the alternative source act as the primary insurer, with Medicare acting as the secondary insurer. Under the MSP statute, when Medicare erroneously pays a claim that should have been paid by a primary insurer, it has the right to recover such payments from the primary insurer. Moreover, the United States contends that it is subrogated to the rights of the individual or entity entitled to payment from the third-party payer.

The HCFA claims that BCBSWV is an entity responsible for payment under the MSP statute, both in its capacity as a private primary insurer and as a third-party administrator of group health insurance plans. The amount of the MSP portion of the HCFA's claim is approximately $570,000. The BCBSWV liquidation Receiver placed this portion of the HCFA's claim into the equivalent of priority Class V under W. Va. Code § 33–24–27, as amended,[11] with claims of general creditors.

### 3. Claim of Office of Personnel Management

A contract, designated Contract No. C.S. 1039, was executed between the Office of Personnel Management [hereinafter "OPM"] and the Blue Cross and Blue Shield Association [hereinafter "the Association"] for provision of health care services for federal employees. The United States submits that the Association executed the agreement as an agent for BCBSWV. In addition, the Association entered a "Participation Agreement" with BCBSWV, which set forth the obligations of the Association and BCBSWV regarding the OPM contract. After BCBSWV was placed into liquidation, the OPM filed a proof of claim arising out of the aforementioned contract it executed with the Association. However, on the recommendation of the Referee, the OPM's claim was disallowed in full by the circuit court based upon its ruling that OPM's contract was with the Association, and not with BCBSWV, and that BCBSWV was merely a third-party adminis-trator of the contract between the Association and OPM.

### 4. Procedural History of United States' Claims

The United States of America, acting on behalf of the above-named agencies, timely filed objections to the provisional plan of distribution proposed by the Receiver, and to the Receiver's notices of determination regarding the above-described federal claims. The objections were directed to the court-appointed Referee, who conducted a hearing on several preliminary legal issues. The Referee subsequently tendered a recommended order rejecting the United States' arguments on each of the preliminary legal issues raised. Because it addressed only preliminary issues, the recommended order did not conclusively resolve all of the United States' claims. By final order entered on January 21, 1997, the Circuit Court of Kanawha County adopted, in full, the recommended order of the Referee resolving the preliminary issues. It is from this January 21, 1997, order that the United States now appeals.

## II.

## APPELLATE JURISDICTION AND STANDARD OF REVIEW

### A.

### Appellate Jurisdiction

■ Before we address the substantive issues raised by the parties, we must first explore the threshold question of our jurisdiction to consider these appeals. PBS and BCWP complain that the circuit court erred by entering its final orders when they did not receive proper notice of the Referee's recommended orders and an opportunity to object to the same. In this particular instance, the errors complained of were not known, in one case, until one day prior to the circuit court's entry of its final order, and, in the other case, until seven days after the entry of the circuit court's final order. Thus, PBS and BCWP could not reasonably have complained of

---

**11.** See supra note 5.

these errors to the circuit court before it entered its final orders. After the circuit court's entry of its final orders in these two cases, the parties did not challenge their lack of notice before that court. Instead, they appealed to this Court. Because PBS and BCWP did not challenge the lack of notice in the lower court, we are presented with an issue that has not been determined by the circuit court.

■ Similarly, the appeal of the United States is before us under rather unique procedural circumstances. As previously mentioned, the issues resolved in the order appealed by the United States were preliminary legal issues. While the order, titled "FINAL ORDER" by the circuit court, conclusively resolved the issues that were before the court, it did not finally terminate the litigation between the United States and BCBSWV.

Typically, we have steadfastly held to the rule that we will not address a nonjurisdictional issue that has not been determined by the lower court. *See Hartwell v. Marquez*, 201 W.Va. 433, 442, 498 S.E.2d 1, 10 (1997) (" 'It is a well established principle that this Court will not decide nonjurisdictional questions which have not been raised in the court below.' " (quoting *Stonebraker v. Zinn*, 169 W.Va. 259, 266, 286 S.E.2d 911, 915 (1982) (additional citations omitted))); Syl. pt. 2, *Trent v. Cook*, 198 W.Va. 601, 482 S.E.2d 218 (1996) (" '[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review.' Syl. Pt. 6, in part, *Parker v. Knowlton Const. Co., Inc.*, 158 W.Va. 314, 210 S.E.2d 918 (1975)."); Syl. pt. 3, *Voelker v. Frederick Business Properties Co.*, 195 W.Va. 246, 465 S.E.2d 246 (1995) (" ' "In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken." Syllabus Point 1, *Mowery v. Hitt*,

155 W.Va. 103[, 181 S.E.2d 334] (1971).' Syl. pt. 1, *Shackleford v. Catlett*, 161 W.Va. 568, 244 S.E.2d 327 (1978)").

■ The mere fact that an issue has been decided by the lower court, however, does not automatically render the issue appealable. We have also generally declined to accept the appeal of a decision of a circuit court that does not finally terminate the litigation between parties:

Under W. Va.Code, 58–5–1 (1925),[12] appeals only may be taken from final decisions of a circuit court. A case is final only when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined.

Syl. pt. 3, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995) (footnote added). We have further explained that

The purpose of the "rule of finality," as it is known, is "to prohibit 'piecemeal appellate review of trial court decisions which do not terminate the litigation[.]' *United States v. Hollywood Motor Car Co., Inc.*, 458 U.S. 263, 265, 102 S.Ct. 3081, 3082, 73 L.Ed.2d 754, 756 (1982)." [*James M.B. v. Carolyn M.*], 193 W.Va. at 292, 456 S.E.2d at 19.

*Gooch v. W.Va. Dep't of Pub. Safety*, 195 W.Va. 357, 362, 465 S.E.2d 628, 633 (1995). As with many rules, the "rule of finality" is subject to exceptions. *See, e.g.*, W. Va. R. Civ. P., Rule 54(b) (permitting, under certain circumstances in cases involving multiple claims or multiple parties, appeal of final judgment "as to one or more but fewer than all of the claims or parties").

Notwithstanding our general refusal to address nonjurisdictional issues not decided below, and our adherence to the rule of finality, we find the issues raised by PBS, BCWP and the United States are properly before us. With regard to the underlying liquidation proceedings, the West Virginia Legislature has provided a statutory exception to the two appellate principles discussed above. *See* W. Va.Code § 33–24–25 (1990) (Repl.Vol.1996).

12. W. Va.Code § 58–5–1 was amended in 1998; however, the earlier version of the statute was in effect at the time relevant to this appeal. The current version of W. Va.Code § 58–5–1 adopts language similar to that contained in W. Va. R. Civ. P., Rule 54(b).

W. Va.Code § 33–24–25 establishes procedures to be followed in liquidation proceedings involving hospital service corporations, medical service corporations, dental service corporations or health service corporations. Included in the liquidation procedures of W. Va.Code § 33–24–25 are directions for resolving objections to the Receiver's determinations in such proceedings. W. Va.Code § 33–24–25 states, in part:

> (c) When a claim is denied in whole or in part by the liquidator ... the claimant may file his objections with the liquidator....

> (d) Whenever objections are filed with the liquidator and the liquidator does not alter his denial of the claim as a result of the objections, the liquidator shall ask the court for a hearing.... The matter may be heard by the court or by a court-appointed referee who shall submit findings of fact along with his recommendation. Upon receipt of such report, the court shall fix a time for hearing the claim....

> (e) At the hearing, all persons interested shall be entitled to appear and the court shall enter an order allowing, allowing in part, or disallowing the claim. *Any such order shall be deemed to be an appealable order.*

(Emphasis added).

■ By virtue of W. Va.Code § 33–24–25, the West Virginia Legislature has removed, in the context of liquidation proceedings involving a hospital service corporation, medical service corporation, dental service corporation or health service corporation, any requirement that parties challenge final orders in the circuit court before pursuing appeals. The omission of a requirement that parties challenge a final order in the circuit court prior to appealing the order to this Court does not, under normal circumstances, require us to consider issues not addressed in the first instance by the circuit court. However, the error presently raised by PBS and BCWP was not known to the parties at a time when it could reasonably have been presented to the circuit court prior to the entry of that court's final order. Thus, our refusal to

consider this issue would forever bar PBS and BCWP from raising this error.

■ Similarly, through W. Va.Code § 33–24–25, the West Virginia Legislature has removed the requirement that a final order must completely and finally resolve a cause of action or terminate litigation between parties to a law suit before such order may be appealed. However, this Court must not be burdened with hearing appeals of every interlocutory order entered by a circuit court in a liquidation proceeding. Thus, we will consider on appeal an order that does not completely and finally resolve a cause of action or terminate litigation between parties to a law suit only when the order purports to dispense with interlocutory issues that may impact the ultimate disposition of the litigation.

■ Consequently, we hold that when the procedures set forth in W. Va.Code § 33–24–25 (1990) (Repl.Vol.1996) have been followed and the circuit court has entered a final order, that order may be appealed even though it does not completely and finally resolve a cause of action arising in the liquidation proceedings or terminate litigation between parties to the liquidation proceedings, so long as the issue appealed may impact the ultimate disposition of the litigation. Moreover, because Section 33–24–25 permits a party to appeal the circuit court's final order directly to this Court, a party is not required to challenge the final order in the circuit court before pursuing its appeal. Any error by the circuit court in connection with the entry of its Section 33–24–25 final order, of which the party could not have reasonably known or which the party could not have reasonably brought to the circuit court's attention prior to the court's entry of its final order, may be raised on an appeal of that final order to this Court.

**B.**

*Standard of Review*

■ Having determined our jurisdiction to consider the issues raised by PBS, BCWP and the United States, we must now consider the appropriate standard for our review of the issues. As explained below, we conclude

the appropriate standard of review for the appeals of PBS and BCWP is *de novo.* We have previously recognized that "[t]he term *'de novo'* means ' "[a]new; afresh; a second time." ' " *West Virginia Div. of Envtl. Protection v. Kingwood Coal Co.,* 200 W.Va. 734, 745, 490 S.E.2d 823, 834 (1997) (quoting *Frymier–Halloran v. Paige,* 193 W.Va. 687, 693, 458 S.E.2d 780, 786 (1995) (quoting *Black's Law Dictionary* 435 (6th ed.1990))).

We have often used the term *"de novo"* in connection with the term "plenary." *See, e.g., Matter of Starcher,* 202 W.Va. 55, 60, 501 S.E.2d 772, 777 (1998) (describing the Court's independent evaluation as *"de novo* or plenary review"); Syl. pt. 3, in part, *Matter of Steven William T.,* 201 W.Va. 654, 499 S.E.2d 876 (1997) (indicating the applicable review by this Court is " 'plenary, independent, and *de novo'* " (citation omitted)); *Tolliver v. Kroger Co.,* 201 W.Va. 509, 513, 498 S.E.2d 702, 706 (1997) (identifying appropriate review as "plenary," and citing for support a case utilizing the term " 'de novo' " (citing Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994))); *Blake v. John Skidmore Truck Stop, Inc.,* 201 W.Va. 126, 129, 493 S.E.2d 887, 890 (1997) (characterizing proper review as "de novo and plenary"). Perhaps more instructive for our present purposes is the definition of the term "plenary," which means "[f]ull, entire, complete, absolute, perfect, unqualified." Black's Law Dictionary 1154 (6th ed.1990) (citation omitted).

■ Common sense dictates that when this Court addresses a previously undecided issue, our review must necessarily be anew and afresh, and it must be full, entire and complete. Therefore, we hold that on the rare occasion that this Court must decide an issue that has not been raised before a lower court, our consideration will be plenary, and we will apply a *de novo* standard of review.

■ The errors assigned by the United States in this appeal challenge the findings of fact and conclusions of law made by the circuit court:

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of

review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 2, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997).

### III.

### DISCUSSION

### A.

#### *Discussion of Issues Raised by Pennsylvania Blue Shield and Blue Cross of Western Pennsylvania*

■ PBS and BCWP argue that the circuit court erred by entering its final orders adopting the recommended orders of the court-appointed Referee when the Referee's recommended orders were not actually served upon PBS and BCWP, individually, or their Pennsylvania counsel, and had not been adequately served upon their West Virginia counsel. This lack of notice, PBS and BCWP argue, effectively denied them of their opportunity to object to the recommended orders.

In response, the Receiver argues that PBS and BCWP have failed to demonstrate that their local counsel provided any notice of a change of address, written or otherwise, to the Referee or the circuit court prior to the issuance of the recommended final order. The Receiver asserts that notice was properly sent to West Virginia counsel at his last-known address. *See* W. Va. R. Civ. P. Rule 5(b). Furthermore, the Receiver argues, throughout the proceedings service was made only on local counsel for PBS and BCWP, and neither company ever complained that their Pennsylvania counsel was not receiving sufficient service of pleadings and orders.

To address this issue, we must resolve whether PBS and BCWP were given adequate notice of, and an opportunity to assert their objections to, the recommended orders submitted to the circuit court by the Referee. We have considered the arguments of the parties and looked to the relevant law. We

conclude that adequate service was not made pursuant to the governing statute.

The parties note that the court-adopted Claimants' Rules, which were intended to govern, procedurally, the proceedings before the court-appointed Referee, contained a provision regarding notice of the Referee's recommended order. Pursuant to a provision contained in § IV of the Claimants' Rules: "The original of the Recommended Order will be filed with the Circuit Clerk, and notice of the filing will be made to the parties of record."

We find this rule to be enigmatic. It fails to specify the individual or entity required to provide notice and further fails to define the phrase "parties of record." Because "parties of record" is not defined, we cannot ascertain whether notice to a party's lawyer is sufficient to comply with the rule, or whether notice to the actual party, individually, is required. Fortunately, our resolution of this issue does not depend upon an interpretation of this rule.

The BCBSWV liquidation proceedings are. governed by W. Va.Code §§ 33–24–14 to –44. Among this series of statutes governing the liquidation of health service corporations is W. Va.Code § 33–24–25(d) (1990) (Repl.Vol. 1996). W. Va.Code § 33–24–25(d) specifically states, in relevant part regarding the resolution of disputes over the Receiver's determination of proofs of claims:

> The matter may be heard by the court or by a court-appointed referee who shall submit findings of fact along with his recommendation. Upon receipt of such report, the court *shall* fix a time for hearing the claim and *shall* direct that the claimant or the receiver, as the court *shall* specify, shall give such notice as the court *shall* determine to such persons as shall appear to the court to be interested therein. *All such notices shall specify the time and place of the hearing and shall concisely state the amount and nature of the claim, the priorities asserted, if any, and the recommendation of the receiver with reference thereto.*

(Emphasis added).

■ The above-quoted statute repeatedly utilizes the word "shall." In this regard, we have previously held that " ' "[t]he word 'shall', in the absence of language in the statute showing a contrary intent on the part of the legislature, should be afforded a mandatory connotation." Point 2 Syllabus, *Terry v. Sencindiver*, 153 W.Va. 651[, 171 S.E.2d 480 (1969) ].' Syl. pt. 3, *Bounds v. State Workmen's Compensation Comm'r*, 153 W.Va. 670, 172 S.E.2d 379 (1970)." Syl. pt. 9, *State ex rel. Goff v. Merrifield*, 191 W.Va. 473, 446 S.E.2d 695 (1994) (citation alteration in original). Thus, W. Va.Code § 33–24–25(d) imposes a mandatory duty upon the circuit court to schedule a hearing and to dictate the specifics of notification, including naming the individual who will be responsible for providing notice and the parties to receive notice. In addition, the statute specifically details the information to be contained in such notice.

There is nothing in the record before this Court indicating that the mandatory procedures outlined in W. Va.Code § 33–24–25(d) were followed by the circuit court. Furthermore, the form of notice ventured by the Referee, by virtue of his attempt to serve local counsel with copies of the recommended orders, was inadequate in that it failed to provide information regarding the scheduled time and place of a hearing on each claim, which would have been impossible to include in these two instances since the court failed to schedule such hearings.

■ With regard to the statutory procedures for liquidating a health service corporation, we have held, in an earlier case involving the liquidation of BCBSWV, that "[s]trict adherence must be given to the express legislative procedures governing the liquidation of health service corporations found in West Virginia Code §§ 33–24–14 to –44 (1992 & Supp.1995)." Syl. pt. 1, in part, *State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.*, 195 W.Va. 537, 466 S.E.2d 388 (1995). Because the circuit court failed to adhere to the mandatory provisions contained in W. Va.Code § 33–24–25(d), requiring the court to schedule a hearing and to dictate the specifics of notification, including naming the individual responsible for providing notice and the parties to re-

ceive such notice, we conclude that PBS and BCWP did not receive proper notice of the Referee's recommended orders. Consequently, as the interested parties did not receive proper notice of, and an opportunity to express their objections to, the respective recommended orders, we find that the circuit court erred in entering its final orders adopting the same.[13] In accordance with this conclusion, we remand the two cases involving PBS and BCWP for hearings in compliance with W. Va.Code § 33–24–25(d).[14]

## B.

### The United States of America [15]

The United States has raised two issues [16] that are within our appellate jurisdiction,[17] the lower court's resolution of the classification of the United States' late-filed claims and the lower court's finding that OPM was not a party to a contract with BCBSWV. First, while the lower court's resolution of the classification of the late-filed claims did not completely and finally resolve a cause of action arising in the liquidation proceedings, leaving this issue unresolved until a later time may have a substantial impact on the ultimate disposition of the litigation by further delaying the already overdue distribution of funds to claim holders. Second, the lower court's finding that the OPM could not pursue its claim against the liquidated estate of BCBSWV, as there was no contract between the OPM and BCBSWV, conclusively terminated the litigation as to the OPM.

### 1. Late–Filed Claims

The law of this State requires that, in liquidation proceedings conducted under W. Va.Code §§ 33–24–14 through –44, proofs of claim must be filed within four months of the circuit court's order declaring the corporation to be insolvent, unless a longer time is prescribed upon certification by the Insurance Commissioner that such additional time is necessary. W. Va.Code § 33–24–37(a)

13. Although the circuit court's failure to follow mandatory statutory procedures requires the remand of this case, we note that the notice problem experienced in this instance could easily have been avoided without the necessity of appeal if McKowen had promptly corrected his address on the court pleadings. It is a lawyer's responsibility to assure that his correct address appears on pleadings. *See* W. Va. R. Civ. P., Rule 11 ("Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, *whose address shall be stated.*" (emphasis added)). Moreover, parties giving notice have the right to rely on addresses provided on pleadings, and are not required to search for the correct address. *See* W. Va. R. Civ. P., Rule 5(b) ("Whenever under these rules service is required or permitted to be made upon a party represented by an attorney of record the service shall be made upon the attorney unless service upon the party himself or herself is ordered by the court. Service upon the attorney or upon a party shall be made by delivering a copy to him or her, *or by mailing it to him or her at his or her last-known address . . . .*" (emphasis added)). Additionally, we note that Rule 18 of the Local Rules for Kanawha County Civil Courts requires that:

All proposed orders shall be submitted to opposing counsel, if known, before the presentation thereof to the court for entry, or reasonable written notice of intention to present a particular order or decree shall be given to opposing counsel, if known, and the court shall be fully advised in the premises contemporane-

ously with the motion for the entry of any such order or decree.

At the bottom of the order space shall be provided for each attorney to whom the order is presented to sign his name to evidence the fact that such attorney has inspected the order, but such signature shall not constitute approval of the order unless so stated in writing by the attorney signing. *Each attorney to whom any order is presented for inspection shall sign the same at the bottom to evidence the fact that such attorney has had notice of such order and inspected the same.*

(Emphasis added). The necessity for appeal in this case may also have been avoided had this local rule been followed.

14. PBS and BCWP raise other issues on appeal. However, because we remand these cases for hearings in the circuit court, the additional issues are not ripe for appeal, and should be first addressed by the circuit court. *See supra* Section II.*A.* at 772–74.

15. *See supra* pages 770–72 for a discussion of the facts relevant to the appeal of the United States.

16. For the reasons explained in Section III.*B.*3. *infra,* we decline to address a third issue raised by the United States.

17. *See supra* Section II.*A.* for a discussion of our jurisdiction to consider the appeal of the United States.

(1990) (Repl.Vol.1996).[18] This deadline for filing proofs of claim is commonly referred to as the "bar" date. In West Virginia, claims filed after the bar date do not share in the distribution of assets of a company in liquidation until all allowed, timely-filed claims have been paid in full with interest. W. Va.Code § 33–24–37(b) (1990) (Repl.Vol. 1996). *See also* W. Va.Code § 33–24–27(g) (1996) (Supp.1998) (assigning Class VII to late-filed claims for purposes of distribution). Thus, the West Virginia bar date does not serve to absolutely prohibit late-filed claims. Rather, it simply assigns late-filed claims to a distribution classification that is subordinate to all timely-filed claims. W. Va.Code § 33–24–27(g). Because the commonly used term "bar" date is somewhat misleading in the context of the West Virginia law in question, since it implies that claims may not be filed after that date, we will heretofore refer to this date as the "timely-claim" date.

During the proceedings underlying this appeal, claims of the United States that were filed after the timely-claim date were delegated by the Receiver to Class VII in the order of distribution, in accordance with W. Va.Code §§ 33–24–37(b) and 33–24–27(g). The United States objected to this classification, and the dispute was referred to the court-appointed Referee. The Referee issued a recommended order affirming the classification assigned by the Receiver. Thereafter, the circuit court affirmed the conclusion of the Referee on this issue.[19]

The United States presents this Court with two arguments urging us to reverse the lower court's disposition of the federal government's late-filed claims. We address these two arguments in turn.

a. **State–Imposed Statute of Limitation.** Before this Court, the United States first argues that the imposition of any limitation date on federal claims is prohibited by the principle that the United States is not bound by state statutes of limitation in actions in which it seeks to enforce its rights as sovereign. *See United States v. Summerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940).

In response to the United States' argument that it is not subject to a state-imposed statute of limitation, the Receiver replies that *United States v. Summerlin,* the case primarily relied upon by the United States, is distinguishable from the case at hand because *Summerlin* did not involve an insurance liquidation proceeding. Moreover, the Receiver argues that West Virginia law regarding the priority of late-filed federal claims is enforceable because it does not invalidate, void and make totally unenforceable the federal claims. Next, the Receiver argues that this issue involves the business of insurance and, thus, falls within the McCar-

---

**18.** The order of liquidation entered by the circuit court on October 26, 1990, directed the Receiver to notify all persons who may have claims against BCBSWV to file their proofs of claim "within four months from the entry of [the] order." Thereafter, by order entered February 22, 1991, the circuit court extended the deadline for timely filing proofs of claim by an additional four months at the request of the Insurance Commissioner/Receiver.

**19.** Following are the particular findings and conclusions of the circuit court that the United States contends are erroneous:

46. The West Virginia Legislature, in amending *West Virginia Code,* § 33–24–27, to specifically address the clash of priorities addressed in [*United States Dep't of the Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993)], elevated the priority of federal claims so long as they otherwise complied with the procedural requirements of the statutory scheme. However, the Legislature adhered to existing law which allows for a diminishment in priority, but not elimination of the claim, if the procedural requirements of the statute were not met.

48. "Where a proof of claim complies with the statutory requirements of *West Virginia Code* § 33–24–25 (1992)[,] but is filed after the claims bar date provided for by statute [or any court-ordered extensions thereof] has elapsed, the proof of claim is properly classified as a Class [VII] late-filed claim as directed by *West Virginia Code* § 33–24–27(f) (1992)". [Syl. pt. 2, *State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.,* 195 W.Va. 537, 466 S.E.2d 388 (1995)].

49. The priority statute does not operate to void or invalidate the claims of the [United States of America] so that they cannot be enforced at all because of being filed after the bar date [timely-claim date], but simply assigns the late-filed claims to a lower class in the order of distribution. Therefore, the statute does not exceed the limits of state powers.

ran–Ferguson Act, 15 U.S.C. § 1011 et seq. (1994 ed.).[20]

■ We have reviewed the arguments presented by the parties, and the statutory and decisional law relevant to their arguments. For the reasons that follow, we conclude that a state may impose a limitation date on federal claims against an insolvent insurance company or health service corporation when that date merely subordinates the priority of late-filed federal claims rather than causing them to be absolutely invalidated.

We begin by analyzing *United States v. Summerlin,* the only United States Supreme Court case cited by the United States in support of its argument. *Summerlin* involved a United States claim against the estate of a deceased individual. The United States filed its claim in a county court in the state of Florida, after the eight-month state-established period for filing such claims had expired. A judge of the county court wherein the claim was filed disallowed the late-filed claim of the United States. On appeal to the county circuit court, the claim was declared void. The Supreme Court of Florida affirmed the circuit court judgment, and the case was appealed to the United States Supreme Court. The Supreme Court stated "[i]t is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights." *Summerlin,* at 416, 60 S.Ct. at 1020, 84 L.Ed. at 1285. The high court went on to explain:

If this were a statute merely determining the limits of the jurisdiction of a probate court and thus providing that the County Judge should have no jurisdiction to receive or pass upon claims not filed within the eight months, while leaving an oportunity [sic] to the United States otherwise to enforce its claim, the authority of the State to impose such a limitation upon its probate court might be conceded. But if *the statute, as sustained by the state court, undertakes to invalidate the claim of the United States, so that it cannot be enforced at all,* because not filed within eight months, we think the statute in that sense transgressed the limits of state power.

*Summerlin,* at 417, 60 S.Ct. at 1021, 84 L.Ed. at 1286 (emphasis added) (citation omitted). Unlike the Florida statute at issue in *Summerlin,* the West Virginia statute does not invalidate late-filed claims of the United States. It merely provides them a subordinate classification so that the liquidation proceeding may advance.

In addition to *Summerlin,* the United States cites a federal circuit court of appeals case and a federal district court case on the topic of the applicability of state statutes of limitation to suits filed by the United States. However, as with *Summerlin,* these two cases involved a state law that completely abrogated the government's claim or suit.[21] The United States has cited no case rendered by the Supreme Court of the United States, or by any other court, involving a time limitation that merely subordinated the interests of the United States.[22]

---

20. Contrary to the Receiver's contention that this portion of the United States' argument is disposed of by operation of the McCarran–Ferguson Act, 15 U.S.C. § 1011 et. seq., we find it necessary to address the state-imposed statute of limitation issue independently of the Act. McCarran–Ferguson states, in relevant part, "[n]o *Act of Congress* shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." (Emphasis added). Because the principle relied upon by the United States in this portion of its argument does not arise from an Act of Congress, we believe that the McCarran–Ferguson Act does not operate to prevent its application. For further discussion of the McCarran–Ferguson Act, see text *infra,* Section III.*B*.1.b.

21. *See United States v. Morgan,* 298 F.2d 255 (4th Cir.1962) (affirming district court decision that rejected defendant lessees' assertion of state statute of limitation as a defense to an action by the United States to recover rent); *United States v. Polan Indus., Inc.,* 196 F.Supp. 333 (S.D.W.Va. 1961) (rejecting defendant's attempt to assert state statute of limitation as defense against suit filed by United States to collect tax assessment from third-party debtor of the taxpayer).

22. Our research has revealed one case decided by the United States Supreme Court, *United States v. John Hancock Mut. Life Ins. Co.,* 364 U.S. 301, 81 S.Ct. 1, 5 L.Ed.2d 1 (1960), wherein the Supreme Court was faced with an issue somewhat similar to the question before us. *John Hancock* involved foreclosure proceedings.

Absent specific authority on this issue, we believe a review of the definition of the term "statute of limitation" aids our determination. Generally, statutes of limitation are recognized as

> [s]tatutes of the federal government and various states setting maximum time periods during which certain actions can be brought or rights enforced. After the time period set out in the applicable statute of limitations has run, *no legal action can be brought regardless of whether any cause of action ever existed.*
>
> A statute prescribing limitations to the right of action on certain described causes of action or criminal prosecutions; that is, *declaring that no suit shall be maintained on such causes of action, nor any criminal charge be made, unless brought within a specified period of. time after the right accrued.*

Black's Law Dictionary 927 (6th ed.1990) (emphasis added) (citation omitted). Unlike a statute of limitation, the time limitation and claim subordination imposed by W. Va.Code §§ 33–24–37(b) and 33–24–27(g) do not prohibit the United States from bringing its

claim. These two statutes merely diminish the priority of any late-filed claim in favor of timely-filed claims. Thus, these provisions do not create a statute of limitation as that term is generally understood.

Another important concern in liquidation proceedings is that available assets be timely distributed.[23] Imposing a limit on the timely filing of proofs of claim in liquidation proceedings promotes an expedient distribution of assets to those with valid claims against the liquidated estate:

> The assets of an insolvent insurer should be distributed as soon as practicable, at the same time that the insurer's policyholders have a strong interest in stating their claims against the insurer's assets. In attempting to balance these interests, a reasonable time may be prescribed within which claims must be filed; and, when a time limit is specified in the relevant statutory scheme, the court has only such authority to allow late claims as may be granted by the statute.

1 Lee R. Russ and Thomas F. Segalla, Couch on Insurance 3d § 6:5 (1997). *See*

---

A note, which was secured by a mortgage on real estate, and which was held by John Hancock Mutual Life Insurance Company, was in default. The United States held a second note secured by a mortgage on the same real estate. The United States' note was junior to the note held by John Hancock. At a foreclosure sale, John Hancock bought the real estate for an amount equal to the amount of the note it held. Under the relevant state law, the debtor/property owner had the *exclusive* right to redeem the foreclosed property for a period of twelve months. If the debtor/property owner failed to redeem during the twelve-month period, the lien creditors then had a three-month period within which to redeem. Under the applicable federal law, the United States had one year from the date of sale within which to redeem the property. Thus, there was a conflict between the state and federal law. The United States attempted to redeem the property pursuant to federal law, and the attempt was rejected by the state courts. Thereafter, *the debtor/property owner redeemed the property as permitted by state law.* On appeal to the Supreme Court of the United States, the conflict was resolved in favor of the United States on grounds not involving the federal government's immunity to state-imposed statutes of limitation. After reaching its conclusion, however, the Court noted that John Hancock advanced several other arguments, one being that "the United States, by seeking affirmative relief in a state court, subjects itself to all the incidents of state law which

govern other suitors." *John Hancock,* at 308, 81 S.Ct. at 6, 5 L.Ed.2d at 6. The Court explained that this contention was easily resolved by one of "the several special rules which favor the United States in preference to other plaintiffs—the rule that the United States *is not subject* to local statutes of limitations." *Id.* (citing *United States v. Summerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940)). Because the debtor/property owner in *John Hancock* redeemed the foreclosed property, the application of state law would have forever barred the United States' right to redeem the real estate, and thus, its right to recover any of the funds due it. Contrariwise, the West Virginia statute in question merely subordinates the United States' claims, and does not operate as a total bar. Consequently, we find the *John Hancock* case, like those mentioned above, is factually and legally distinguishable from the issue before us.

23. As the BCBSWV liquidation proceedings demonstrate, speedy resolution is not always possible or practicable in complex liquidations involving large numbers of claimants and complicated legal issues. However, we do not believe that time-consuming complex cases should be further delayed through the abandonment of administrative aids such as West Virginia's imposition of a timely-claim date.

*also* 43 Am.Jur.2d *Insurance* § 98, at 178 (1982) ("When an insurance company becomes insolvent, its funds are to be distributed among its creditors as their claims then exist, and the distribution of such assets at an early date is important because it prevents postponing the settlement to await the determination of every contingency on which its policy engagements may be suspended. Accordingly, a court having charge of the affairs of an insolvent insurance company may fix a reasonable time within which claims must be filed in order to participate in the distribution of assets, and may fix a date beyond which no claims shall be presented or allowed, with the consequence that claims not so presented and allowed are barred [or, as in West Virginia, subordinated], unless the court sees fit, as it has power to do, to extend the time for good cause shown." (footnotes omitted)).

■ The West Virginia statutory scheme for liquidating an insolvent insurance company plainly attempts to accomplish this timely resolution of claims against the liquidated estate of the company in receivership, while at the same time assuring that all claims, even those filed late, will be paid where the liquidated estate is large enough to fulfill lower classified claims. Under the operation of W. Va.Code §§ 33–24–37(b) and 33–24–37(a), no proofs of claim are rendered void or invalid due to their untimely filing. Consequently, we hold that W. Va.Code § 33–24–37(b) (1990) (Repl.Vol.1996), which directs that proofs of claim filed after the time prescribed by the circuit court pursuant to W. Va.Code § 33–24–37(a) (1990) (Repl.Vol.1996)

shall not share in the distribution of assets of the company in liquidation until all allowed claims that were timely filed have been paid in full with interest, and W. Va.Code § 33–24–27(g) (1996) (Supp.1998), which assigns late-filed proofs of claim to Class VII for purposes of distribution, do not violate the principle that the United States is not bound by state statutes of limitation when enforcing its rights as sovereign.[24]

■ **b. Federal Preemption.** We turn now to the United States' argument that W. Va.Code § 33–24–27 (1996) (Supp.1998), which specifies the order of distribution for claims against the liquidated estate of an insolvent company, is preempted by the federal priority statute found at 31 U.S.C. § 3713 (1982) (1994 ed.).[25]

The United States acknowledges that there is an exception to federal preemption of a state law in circumstances where the state law regulates the business of insurance. *See* McCarran–Ferguson Act, 15 U.S.C. §§ 1011 and 1012. Furthermore, the United States concedes that the question of whether state laws pertaining to insurance liquidation regulate the business of insurance has been addressed by the United States Supreme Court. *See United States Dep't of the Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449. The United States explains, however, that the *Fabe* Court concluded that state laws governing the liquidation of an insurance company regulate the business of insurance only to the extent that such laws protect policyholders. The United States argues that, because West Virginia

**24.** *But see United States v. Middle States Oil Corp.,* 18 F.2d 231 (8th Cir.1927) (concluding that priority of late-filed claims of United States in bankruptcy proceeding could be subordinated only when the assets of the bankruptcy estate were sufficient to satisfy all claims against the estate, including those of the United States); *United States v. Vellalos,* 780 F.Supp. 705, 707 (D.Haw.1992) (stating in dicta that a "state may not limit the federal government's general common law right to collect debts owed to it").

**25.** 31 U.S.C. § 3713 (1982) (1994 ed.) states:

(a)(1) A claim of the United States Government shall be paid first when—

(A) a person indebted to the Government is insolvent and—

(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;

(ii) property of the debtor, if absent, is attached; or

(iii) an act of bankruptcy is committed; or

(B) the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.

(2) This subsection does not apply to a case under title 11.

(b) A representative of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.

law permits priority diminution of late-filed federal claims to place the interests of general creditors ahead of the federal government, it does not sufficiently protect policyholders and, thus, is subject to federal preemption. *See Garcia v. Island Program Designer, Inc.,* 4 F.3d 57 (1st Cir.1993) (applying *Fabe* and concluding state priority law was preempted).

To the contrary, the Receiver contends that, under *Fabe* and the McCarran–Ferguson Act, the West Virginia priority statute is not preempted. The Receiver submits that *Garcia* has been twice rejected as reading *Fabe* too narrowly. *See Boozell v. United States,* 979 F.Supp. 670 (N.D.Ill.1997); *Stephens v. American Int'l Ins. Co.,* 66 F.3d 41, 45 (2d Cir.1995). Moreover, the Receiver explains that without an enforceable timely-claim date, payment of policyholders' claims cannot occur. According to the Receiver, the position advanced by the United States, if followed, would convert the liquidation proceeding into a proceeding of uncertainty. The Receiver, who is personally liable to the United States for satisfaction of government claims having priority over claims already paid, would be unable to distribute assets to policyholders without fear of the existence of a significant, but unfiled, claim of the United States that would have priority over claims already paid. Thus, the priority statute regulates the business of insurance by protecting policyholders and is not preempted by federal law. For the reasons explained below, we agree with the Receiver's conclusion.

We begin our analysis with a brief review of the history of the McCarran—Ferguson Act. Prior to 1944, " 'the States enjoyed a virtually exclusive domain over the insurance industry.' " *United States Dep't of the Treasury v. Fabe,* 508 U.S. 491, 499, 113 S.Ct. 2202, 2207, 124 L.Ed.2d 449, 458 (quoting *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 539, 98 S.Ct. 2923, 2928, 57 L.Ed.2d 932, 939 (1978)). In 1944, this nearly exclusive domain was called into question by a decision of the United States Supreme Court rendered in *United States v. South–Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). The Court has since explained:

*South–Eastern Underwriters* ... held that an insurance company that conduced a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to the antitrust laws. This result, naturally, was widely perceived as a threat to state power to tax and regulate the insurance industry. To allay those fears, Congress moved quickly to restore the supremacy of the States in the realm of insurance regulation. It enacted the McCarran–Ferguson Act within a year of the decision in *South–Eastern Underwriters.*

*Fabe,* at 499–500, 113 S.Ct. at 2207, 124 L.Ed.2d at 458.

The McCarran–Ferguson Act, codified at 15 U.S.C. § 1011 et seq., states in relevant part:

### § 1011. Declaration of policy

Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

### § 1012. Regulation by State law; Federal law relating specifically to insurance....

#### (a) State regulation

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

#### (b) Federal regulation

*No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance ....*

(Emphasis added).

While the United States argues that West Virginia law is preempted by 31 U.S.C.

§ 3713,[26] there is nothing in that provision specifically relating to the business of insurance. Thus, as the above quote demonstrates, if W. Va.Code § 33–24–27 (1996) (Supp.1998) was enacted "for the purpose of regulating the business of insurance," then it reverse preempts[27] 31 U.S.C. § 3713. 15 U.S.C. § 1012(b).

In determining whether W. Va.Code § 33–24–27 was enacted to regulate the business of insurance, we find much guidance in *United States Department of the Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449. In *Fabe,* the United States Supreme Court considered whether an Ohio statute assigning priorities for claims against an insolvent insurance company qualified as a statute that regulated the business of insurance. The *Fabe* Court first noted its previous decision in *Securities and Exch. Comm'n v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668, 676 (1969), wherein it construed the phrase " 'for the purpose of regulating the business of insurance.' " *Fabe,* at 501, 113 S.Ct. at 2208, 124 L.Ed.2d at 459. The Court noted that the *National Securities* opinion "emphasized that the focus of McCarran–Ferguson is upon the relationship between the insurance company and its policyholders." *Id.* The *Fabe* Court then explained that " " '[s]tatutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly, are laws regulating the "business of insurance" ' within the meaning of the phrase." *Id.* (quoting *Securities and*

*Exch. Comm'n v. National Sec., Inc.,* at 460, 89 S.Ct. at 568, 21 L.Ed.2d at 676).

Further considering the insurance company/policyholder relationship and its correlation to the concept of "regulating the business of insurance," the *Fabe* Court analyzed its decisions in *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), and *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979),[28] and concluded that "[t]here can be no doubt that the *actual performance* of an insurance contract falls within the 'business of insurance,' as we understood that phrase in *Pireno* and *Royal Drug.*" *Fabe,* at 503, 113 S.Ct. at 2209, 124 L.Ed.2d at 461 (emphasis added). The Court then reasoned that the Ohio priority statute was "designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy. Because it is integrally related to the performance of insurance contracts after bankruptcy, Ohio's law is one 'enacted by any State for the purpose of regulating the business of insurance.' 15 U.S.C. § 1012(b)." *Id.* at 504, 113 S.Ct. at 2209, 124 L.Ed.2d at 461. The Court stated further

> [t]he broad category of laws enacted "for the purpose of regulating the business of insurance" consists of laws that possess the "end, intention, or aim" of adjusting, managing, or controlling the business of insurance. Black's Law Dic-

26. See *supra* note ·25 for the text of 31 U.S.C. § 3713.

27. By the term "reverse preempt" we mean that, under the McCarran–Ferguson Act, state law regulating the business of insurance will be enforced over conflicting federal law that does not specifically relate to the business of insurance. In other words, the normal course of preemption is reversed in that state law will preempt federal law. *See, e.g., Munich Am. Reinsurance Co. v. Crawford,* 141 F.3d 585, 592–94 (5th Cir.1998) ("Ordinarily, federal law pre-empts conflicting state law by virtue of the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2. The McCarran–Ferguson Act reverses that effect in the narrow range of cases involving state regulation of the insurance industry. By its terms, the Act permits a

state law to reverse pre-empt a federal statute ....")

28. In *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), and *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the United States Supreme Court identified three factors to be considered in determining what constitutes the "business of insurance." Those three factors are: *"first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry." *Pireno,* at 129, 102 S.Ct. at 3009, 73 L.Ed.2d at 656.

tionary 1236, 1286 (6th ed.1990). This category necessarily encompasses more than just the "business of insurance." ... [W]e believe that the actual performance of an insurance contract is an essential part of the "business of insurance." Because the Ohio statute is "aimed at protecting or regulating" the performance of an insurance contract, ... it follows that it is a law "enacted for the purpose of regulating the business of insurance," within the meaning of the first clause of [15 U.S.C. § 1012(b) ].

*Id.* at 505, 113 S.Ct. at 2210, 124 L.Ed.2d at 462 (internal citation omitted).

However, the Court did not end its analysis here, but continued to explain that "[t]he primary purpose of a statute that distributes the insolvent insurer's assets to policyholders in preference to other creditors is identical to the primary purpose of the insurance company itself: the payment of claims made against policies." *Id.* at 505–06, 113 S.Ct. at 2210, 124 L.Ed.2d at 462.

The *Fabe* Court held that

the Ohio priority statute, to the extent that it regulated policyholders, is a law enacted for the purpose of regulating the business of insurance. To the extent that it is designed to further the interests of other creditors, however, it is not a law enacted for the purpose of regulating the business of insurance.

*Id.* at 508, 113 S.Ct. at 2212, 124 L.Ed.2d at 464.

Observing that "every preference accorded to the creditors of an insolvent insurer ultimately may redound to the benefit of policyholders by enhancing the reliability of the insurance company," the Court noted *"Royal Drug* rejected the notion that such indirect effects are sufficient for a state law to avoid pre-emption under the McCarran–Ferguson Act." *Id.* at 508–09, 113 S.Ct. at 2212, 124 L.Ed.2d at 464 (citing *Royal Drug,* 440 U.S. at 217, 99 S.Ct. at 1076, 59 L.Ed.2d at 271–72). Finally, the *Fabe* Court applied its earlier holding to the Ohio statute, and further held that:

[T]he preference accorded by Ohio to the expenses of administering the insolvency proceeding is reasonably necessary to further the goal of protecting policyholders. Without the payment of administrative

costs, liquidation could not even commence. The preferences conferred upon employees and other general creditors, however, do not escape pre-emption because their connection to the ultimate aim of insurance is too tenuous.

*Id.* at 509, 113 S.Ct. at 2212, 124 L.Ed.2d at 465 (citation omitted).

Based upon the foregoing, it is clear that in order to settle whether the priorities imposed by W. Va.Code § 33–24–27(g) on late-filed claims of the United States are enforceable in the face of conflicting federal law that is not specifically directed toward regulating insurance, we must ascertain whether W. Va.Code § 33–24–27(g) regulates the business of insurance. In making this determination, we must consider whether W. Va. Code § 33–24–27(g) protects or regulates policyholders either directly or indirectly so long as the connection to the regulation of insurance is not too tenuous. We believe that it does.

West Virginia's timely-claim date and associated priority diminution protect policyholders by assuring their claims will be handled in a timely and orderly fashion and by reducing the administrative costs of liquidation, thereby preserving more of the assets of the liquidated estate for distribution to claimants, particularly policyholders as they must be fully compensated before distributions are made to lower classified claimants. The timely-claim date and associated priority diminution are thus integral to the administration of liquidation proceedings. Without a set date by which all timely claims must be filed, there could be no timely and orderly distribution of assets. In addition to the difficulty created by the possibility of additional claims that might be filed at any time, the Receiver has the added concern that, under 31 U.S.C. § 3713(b), the federal priority statute, "[a] representative of a person or an estate ... paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government." Moreover, the unnecessary delays and complications to the liquidation process *that would be caused by the absence of an enforceable timely-claim date would increase*

the amount of administrative expenses. Because administrative expenses must be paid prior to compensating the claims of policyholders, increases in administrative costs directly harm policyholders by reducing the amount they are likely to recover on their claims. Due to the substantial benefit of timely and orderly distribution of assets to policyholders, the fact that claim holders other than policyholders may also benefit from the enforcement of the timely-claim date and associated claim diminution is immaterial.

We are aware of only one case where the issue of the subordination of late-filed claims of the United States in insurance liquidation proceedings has been addressed directly. In *Garcia v. Island Program Designer, Inc.,* 4 F.3d 57 (1st Cir.1993), the United States Court of Appeals for the First Circuit considered whether a Puerto Rico statute that subordinated the priority of late-filed claims in insurance liquidation proceedings was preempted by federal law insofar as it applied to claims of the federal government. The *Garcia* Court applied *Fabe* and concluded that the Puerto Rico statute did not regulate the business of insurance, and, therefore, the McCarran–Ferguson Act did not apply. In reaching this conclusion, the *Garcia* Court reasoned:

> The filing deadline (with its penalty of subordination for late claims) cannot be said to directly "regulate[ ] policyholders," for it is neither directed at, nor necessary for, the protection of policyholders, as the [*Fabe*] Court required. The provision helps policyholders only to the extent that (and in the same way as) it helps all creditors. That is to say, by penalizing late-filers, the Commonwealth provision may bring about more speedy, orderly liquidation proceedings, thereby (perhaps) reducing the risks (and costs) of extending credit to the company.

> Nor can one say that the Commonwealth's filing deadline provision is necessary for the protection of policyholders.... The Commonwealth's filing deadline at issue here ... is not necessary for a liquidation. Without it, liquidation would still prove manageable. At worst, the trustee's job would become

slightly more difficult. He would have to provide, for example, the United States with a first priority as long as he had, say, actual notice (or "constructive" notice through recording) of the claim, even if he did not have formal notice through a "proof of claim" filed directly in the liquidation proceedings.

*Garcia,* 4 F.3d at 62.

The decision of the *Garcia* Court with respect to the application of *Fabe* on the issue of federal preemption has not been followed by any other court. In fact, the decision has been criticized as interpreting *Fabe* too narrowly. *See Boozell v. United States,* 979 F.Supp. 670 (N.D.Ill.1997).

In *Boozell,* the United States District Court for the Northern District of Illinois was asked to determine whether an Illinois insurance liquidation priority statute violated *Fabe* by requiring policyholders to "compete on an equal basis with state guaranty funds for payment of claims." 979 F.Supp. at 678. The *Boozell* Court expressly rejected *Garcia* as interpreting *Fabe* too narrowly, and commented:

> The *Fabe* holding, as appropriately noted in *Stephens* [*v. American International Insurance Co.,* 66 F.3d 41 (1995)], is a broader interpretation of the Supreme Court's prior holding in *SEC v. National Securities, Inc.* Thus, the *Fabe* holding attempts to give meaning to the plain wording of the McCarran–Ferguson Act by exempting any state law which directly or indirectly assists policyholders from federal preemption.

*Id.* In reaching the conclusion that the Illinois statute was not preempted, the *Boozell* Court reasoned that the guaranty association was designed to protect policyholders of an insolvent insurer by continuing coverage and paying claims to any policyholders of an insolvent insurer in exchange for "a limited priority recovery of assets from the insolvent insurer." *Id.* Moreover, the Court noted that "[p]olicyholders who receive payments on other benefits from a guaranty association are deemed to have assigned their rights under the covered policies to the association to the extent of the benefits provided," and, thus, the guaranty association was "entitled

to the same priority as the policyholders would have had with respect to the assigned claims." *Id.*

While other courts have not expressly criticized *Garcia*, they have afforded *Fabe* a much broader interpretation than did the *Garcia* court. *See Stephens v. American Int'l Ins. Co.*, 66 F.3d 41 (2d Cir.1995).

In *Stephens v. American International Insurance Co.*, the United States Court of Appeals for the Second Circuit considered whether an anti-arbitration clause contained in a Kentucky statute governing liquidation of insurers was preempted by the Federal Arbitration Act. The Court of Appeals reasoned that the anti-arbitration clause "regulate[d] the performance of insurance contracts once an insurance company ... is declared insolvent and enters liquidation. It is crucial to the 'relationship between [an] insurance company and [a] policyholder' that both parties know that in the case of insolvency, the insurance company will be liquidated in an organized fashion." *Stephens* at 44–45 (citation omitted). Relying on *Fabe*, the Court concluded that the statute in question was protected from preemption by the McCarran–Ferguson Act, and stated:

> The Kentucky Liquidation Act has the "end, intention, or aim of adjusting, managing or controlling the business of insurance," in that it regulates the winding up of an insolvent insurance company. The Liquidation Act "protects" policyholders ... by assuring that an insolvent insurer will be liquidated in an orderly and predictable manner and the anti-arbitration provision is simply one piece of that mechanism.

*Id.* at 45 (citation omitted). *See also Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 592–94 (5th Cir.1998) (addressing whether an Oklahoma state court had the authority, under state law governing insurance delinquency proceedings, to enjoin an action in federal court to enforce the Federal Arbitration Act, where such action violated an earlier entered state court injunction prohibiting any actions against the insolvent insurance company or the Receiver; observing that while *Fabe* suggested "that a statute may require parsing to determine the extent of its

pre-emptive power under the McCarran–Ferguson Act," the Court did not preclude, in some circumstances, the determination that a state insurance liquidation act, as a whole, was enacted to regulate insurance and, thus, reverse preempts federal law; commenting further that "it is crucial to the relationship between the insurance company and its policyholders for both parties to know that, in the event of insolvency, the insurance company will be liquidated in an organized fashion" (citing *Stephens v. American Int'l Ins. Co.*); and concluding that Oklahoma state laws were "reasonably necessary to further the goal of protecting policyholders, even though they may also benefit other creditors"); *Murff v. Professional Med. Ins. Co.*, 97 F.3d 289, 291 (8th Cir.1996) (conducting *Fabe* analysis and deciding, in part, that the portion of a Missouri insurers' insolvency act instituting a stay of all actions against an insolvent insurer inverse preempted the Federal Age Discrimination in Employment Act, as state statute is "'a law regulating the business of insurance,'" which "protects policyholders because it preserves the assets of the insolvent insurer's estate, thereby enhancing the ability of an insolvent insurance company to perform its contractual obligations" (footnote omitted)).

We believe that the courts affording a broader interpretation of *Fabe* have chosen the better course. Similarly, we find that the claim priority diminution of W. Va.Code § 33–24–27 sufficiently protects policyholders so that, under the McCarran–Ferguson Act, it reverse preempts the federal priority statute found at 31 U.S.C. § 3713. Accordingly, for the foregoing reasons, we hold that W. Va.Code § 33–24–27 (1996) (Supp.1998), which specifies the order of distribution for claims against the liquidated estate of certain insolvent insurance companies and assigns late-filed claims to distribution priority VII, is a law that was enacted for the purpose of regulating the business of insurance in that it operates to protect the claims of policyholders. Thus, under the operation of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011, 1012 (1994 ed.), W. Va.Code § 33–24–27 reverse preempts the federal priority statute found at 31 U.S.C. § 3713 (1982) (1994 ed.).

## 2. OPM Contract

The United States also argues that the circuit court erred in concluding that Contract No. C.S. 1039 was not a contract between OPM and BCBSWV.[29]  Specifically, the United States contends that the circuit court ignored uncontradicted documentary evidence that BCBSWV authorized the Association to act on its behalf, as its agent, in entering the contract.  Although BCBSWV did not individually execute the contract, the United States asserts that BCBSWV is bound thereto by operation of the law of agency as though it had executed the contract.

The Receiver responds that there was no privity of contract between OPM and BCBSWV, as there is no contract that OPM and BCBSWV entered into together.  Additionally, the Receiver contends that the OPM and the Association were the only parties to the contract in question, and that BCBSWV simply acted as a third-party administrator of that contract.

After considering the parties' arguments, and examining the relevant contractual agreements, we find that the Association was, in fact, acting as an agent for BCBSWV when it executed Contract No. C.S. 1039 with the OPM. Contract No. C.S. 1039 expressly states: "This Contract . . . is now by and between the United States Office of Personnel Management . . . and the following party: (1) Blue Cross and Blue Shield Association, an Illinois not-for-profit Corporation, acting pursuant to authority specified in Exhibit A *for and in behalf of the organization specified in Exhibit A* . . . ." (Emphasis added). Exhibit A, as referred to in Contract No. C.S. 1039, is an agreement between the Association and BCBSWV.  "ARTICLE I" of Exhibit A provides:

The Association *is hereby authorized and directed by the undersigned Plan to execute on behalf of the Plan* the necessary documents, including any amendments thereof, with the United States Office of Personnel Management . . . to furnish health benefits through the undersigned Plan and other similar Plans as provided by the Government-wide Service Benefit Plan, to those employees and annuitants, including their dependents, if any, enrolled under the Contract between the Association and the Agency.

(Emphasis added).  Finally, a plan participation agreement entered between the Association and BCBSWV to set forth their respective obligations under Contract No. C.S. 1039 begins by stating:

WHEREAS, *the undersigned Plan has executed an agreement authorizing the Blue Cross and Blue Shield Association . . . to obligate the Plan to provide benefits under Title 5, Chapter 89, United States Code* (hereinafter referred to as the "Federal Employee Program" or "FEP"); and

WHEREAS, the Association and the U.S. Office of Personnel Management have entered into a Contract for the Provision of health care benefits under FEP . . .

(Emphasis added).

When considering questions of contract, we have frequently held that:

" 'It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.' *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962), Syllabus Point 3." Syllabus Point 2, *Bennett v. Dove,* 166 W.Va. 772, 277 S.E.2d 617 (1981).

---

29.  The following findings of fact and conclusions of law are identified by OPM as erroneous:

20.  The USA asserts that the Office of Personnel Management claims arise on behalf of subscribers to the USA's own health care program, while the Receiver asserts [and the Referee agrees] that Blue Cross Blue Shield West Virginia was a third party administrator

27.  The USA's claim, including that asserted on behalf of the Office of Personnel Management, is not the claim of a policyholder of Blue Cross Blue Shield West Virginia within the meaning of *West Virginia Code* § 33–24–27(b).

28.  The USA's claim is not a claim for refund of unearned premiums or of a policyholder within the meaning of *West Virginia Code* § 33–24–27(b).

29.  The claims of the USA are not losses incurred as a policyholder within the meaning of *West Virginia Code* § 33–24–27(b).

Syl. pt. 1, *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont,* 196 W.Va. 97, 468 S.E.2d 712 (1996). *See also* Syl. pt. 1, *Bennett v. Dove,* 166 W.Va. 772, 277 S.E.2d 617 (1981) (" 'A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.' *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962), Syllabus Point 1.").

█ The above-quoted language from the various contracts is clear and unambiguous, and expresses that the Association was authorized and directed by BCBSWV to execute Contract No. C.S. 1039 with OPM on behalf of BCBSWV. When a person or entity is authorized and directed to act on behalf of another, that person or entity is generally recognized as acting in the capacity of an agent. We have held that " ' "[a]n agent in the restricted and proper sense is a representative of his principal in business or contractual relations with third persons ...." Syllabus Point 3, [in part,] *State ex rel. Key v. Bond,* 94 W.Va. 255, 118 S.E. 276 (1923).' Syl. Pt. 2, [in part,] *Teter v. Old Colony Co.,* 190 W.Va. 711, 441 S.E.2d 728 (1994)." Syl. pt. 3, in part, *Thomson v. McGinnis,* 195 W.Va. 465, 465 S.E.2d 922 (1995). *See generally* 3 Am.Jur.2d *Agency* § 1, at 509–10 (1986) ("The term 'agency' means a fiduciary relationship by which a party confides to another the management of some business to be transacted in the former's name or on his account, and by which such other assumes to do the business and render an account of it. It has also been defined as the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. Thus, the term 'agency,' in its legal sense, always imports commercial or contractual dealings between two parties by and through the medium of another. In an agency relationship, ... the one who acts for and represents the principal, and acquires his authority from him, is known and referred to as an 'agent.' " (footnotes omitted)); 2A C.J.S. *Agency* § 4, at 552, 554–55 (1972) (stating that "[a]gency is succinctly defined

as a relation created by an agreement between the parties; relationship between a principal and his agent; the representation of one called the principal by another called the agent in dealing with third persons; the relation resulting where one person authorizes another to act for him in business dealings with others," and defining agent as "one who acts for or in the place of another by authority from him; a person having express or implied authority to represent or act on behalf of another person who is called his principal; a person employed or authorized by another to act for him, or to transact business for him...." (footnotes omitted)); 1A Michie's Jurisprudence *Agency* § 2, at 666 (1993) ("An agent is one who represents another, called the principal, in dealings with third persons. He is one who undertakes some business or to manage some affair for another by authority of or on account of the latter and to render an account of it." (footnotes omitted)).

Because the Association was acting as an agent for BCBSWV, with express authority to enter a contract obligating BCBSWV to furnish health benefits to certain federal employees, BCBSWV is bound by the contract as if it had executed the contract on its own behalf rather than through the Association. *See* Syl. pt. 1, *Bank of White Sulphur Springs v. Lynch,* 93 W.Va. 382, 116 S.E. 685 (1923) ("A principal is liable for the contract of his agent made within the scope of his Authority."). *See also* 3 Am.Jur.2d *Agency* § 270, at 771–72 (1986) ("[A] principal is bound by, and is liable upon, a contract executed properly as to form by his agent, within the actual or apparent authority of the agent, and with the understanding that the agent is contracting on behalf of the principal."); 3 C.J.S. *Agency* § 406, at 245 (1973) ("Since an agent acts for his principal in a representative capacity, the principal, rather than the agent, is ordinarily bound by contracts entered into on his behalf by his agent when the making of such contracts is within the scope of the agent's actual or apparent authority."); 1A Michie's Jurisprudence *Agency* § 81, at 734 (1993) ("Where an agent's authority is proved, no question of privity can arise. The doctrine of principal

and agent, whether disclosed or undisclosed, recognizes that privity of contract exists between the principal and one dealing with the agent. The act of the agent is the act of the principal.") (footnote omitted).

■ For the foregoing reasons, we conclude that BCBSWV was a party to Contract No. C.S. 1039. Therefore, OPM, as a party to a contract with BCBSWV, is entitled to assert any claims it may have arising from that contract. Consequently, we remand this case for further consideration of OPM's claims.

### 3. Classification of the United States' Claims

■ Lastly, the United States asserts that the circuit court erred in finding that:

21. The claims of the USA relating to the treatment of veterans, and of the Health and Human Services, are claims which arise out of the USA's providing of medical services either directly or through third parties, and not through policies of insurance issued to such beneficiaries by Blue Cross Blue Shield West Virginia.

In this regard, the United States first argues that the circuit court misinterpreted the basis for the VA's and HCFA's claims. These claims, the United States asserts, represent payment by a federal agency of costs that should have been paid by BCBSWV under policies held by individual veterans, Medicare beneficiaries or military dependents. Thus, they are derivative of policyholder claims because the agencies are subrogated to the right of the policyholders to be paid.

Next, the United States contends that the circuit court erred by excluding the United States' subrogation claims from Class II when the Receiver's Plan of Distribution places the subrogation claims of private providers in that class. The United States also complains that the Plan of Distribution proposed a two-tiered scheme of distribution, which impermissibly elevates individual subscribers' claims above the claims of the United States and violates the West Virginia priority statute, which prohibits creating any subclass within any class.

Finally, the United States argues in the alternative that the circuit court erred in entering Finding 21 as that finding exceeded the limited scope of the issues presented to the court in preliminary briefs.

The Receiver responds that the complained of finding of the circuit court is simply a correct factual statement that the claims of the VA and HCFA are not claims of policyholders of BCBSWV. Furthermore, the Receiver asserts, the finding does not assign a particular priority class to the claims of the VA or HCFA. Thus, the Receiver is uncertain as to how this finding adversely affects the VA, since timely filed VA claims have been assigned Class II priority. The Receiver also states that the facts surrounding this issue have yet to be developed in the circuit court. Thus, the Receiver suggests, the United States is premature in asserting that Finding 21 adversely affects the claims of the VA or HCFA. Finally, the Receiver submits that the United States failed to complain of a two-tiered scheme of distribution in its objections to the Receiver's proposed plan of distribution.

On its face, Finding 21 appears to state simply that the claims of the VA and HCFA are not policyholder claims. As the Receiver notes, there is nothing in the finding that assigns a classification to those claims. Moreover, the Receiver's assertion that the facts must be further developed in the circuit court before this issue can be resolved is undisputed, and finally, we note that the United States failed to complain of a two-tiered scheme of distribution before the court below. Thus, because the issues herein raised by the United States have not been decided by the lower court, we adhere to our general practice and decline to address them on appeal. See Hartwell v. Marquez, 201 W.Va. 433, 442, 498 S.E.2d 1, 10 (1997) (" 'It is a well established principle that this Court will not decide nonjurisdictional questions which have not been raised in the court below.' " (quoting Stonebraker v. Zinn, 169 W.Va. 259, 266, 286 S.E.2d 911, 915 (1982) (additional citations omitted))); Syl. pt. 2, Trent v. Cook, 198 W.Va. 601, 482 S.E.2d 218 (1996) (" '[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the por-

tions of the record designated for appellate review.' Syl. Pt. 6, in part, *Parker v. Knowlton Const. Co., Inc.,* 158 W.Va. 314, 210 S.E.2d 918 (1975)."); Syl. pt. 3, *Voelker v. Frederick Bus. Properties Co.,* 195 W.Va. 246, 465 S.E.2d 246 (1995) (" ' "In the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken." Syllabus Point 1, *Mowery v. Hitt,* 155 W.Va. 103[, 181 S.E.2d 334] (1971).' Syl. pt. 1, *Shackleford v. Catlett,* 161 W.Va. 568, 244 S.E.2d 327 (1978)").

### IV.

### CONCLUSION

For the reasons set forth in this opinion, the two final orders of the Circuit Court of Kanawha County, entered on January 13, 1997, and January 21, 1997, pertaining to Blue Cross of Western Pennsylvania and Pennsylvania Blue Shield respectively, are reversed and remanded for further proceedings consistent with this opinion. The final order entered by the circuit court on January 21, 1997, concerning the United States of America, is affirmed in part, reversed in part and is also remanded for further proceedings consistent with this opinion.

Affirmed in part, Reversed in part and Remanded.